# SMITH *v.* UNITED STATES

No. 75–1439.  Argued December 8, 1976—Decided May 23, 1977

*Tefft W. Smith* argued the cause and filed briefs for petitioner.

*Howard E. Shapiro* argued the cause for the United States. On the brief were *Solicitor General Bork, Assistant Attorney General Thornburgh,* and *Jerome M. Feit.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

In *Miller* v. *California,* 413 U. S. 15 (1973), this Court rejected a plea for a uniform national standard as to what

*Briefs of *amici curiae* urging reversal were filed by *William D. North* for the American Library Assn. et al.; and by *Henry R. Kaufman* and *Ira M. Millstein* for the Association of American Publishers, Inc., et al.

*Charles H. Keating, Jr.,* and *James J. Clancy* filed a brief for Citizens for Decency Through Law, Inc., as *amicus curiae* urging affirmance.

appeals to the prurient interest and as to what is patently offensive; the Court held, instead, that these essentially were questions of fact to be measured by contemporary standards of the community. *Id.,* at 30–34. The instant case presents the issue of the constitutional effect of state law that leaves unregulated the distribution of obscene material to adults, on the determination of contemporary community standards in a prosecution under 18 U. S. C. § 1461 for a mailing that is wholly intrastate. The case also raises the question whether § 1461 is unconstitutionally vague as applied in these circumstances, and the question whether the trial court, during the *voir dire* of prospective jurors, correctly refused to ask proffered questions relating to community standards.

I

Between February and October 1974 petitioner, Jerry Lee Smith, knowingly caused to be mailed various materials from Des Moines, Iowa, to post office box addresses in Mount Ayr and Guthrie Center, two communities in southern Iowa. This was done at the written request of postal inspectors using fictitious names. The materials so mailed were delivered through the United States postal system to the respective postmasters serving the addresses. The mailings consisted of (1) issues of "Intrigue" magazine, depicting nude males and females engaged in masturbation, fellatio, cunnilingus, and sexual intercourse; (2) a film entitled "Lovelace," depicting a nude male and a nude female engaged in masturbation and simulated acts of fellatio, cunnilingus, and sexual intercourse; and (3) a film entitled "Terrorized Virgin," depicting two nude males and a nude female engaged in fellatio, cunnilingus, and sexual intercourse.

II

For many years prior to 1974 the statutes of Iowa made it a misdemeanor to sell or offer to sell or to give away "any obscene, lewd, indecent, lascivious, or filthy book, pamphlet,

paper, . . . picture, photograph, writing . . ." or to deposit in any post office within Iowa any article of that kind. Iowa Code §§ 725.5 and 725.6 (1973).

In 1973, however, the Supreme Court of Iowa, in response to the standards enunciated in *Miller* v. *California, supra,* unanimously held that a related and companion Iowa statute, § 725.3 of the 1973 Code, prohibiting the presentation of any obscene or immoral drama, play, exhibition, or entertainment, was unconstitutionally vague and overbroad. *State* v. *Wedelstedt,* 213 N. W. 2d 652.[1] *Wedelstedt,* at least by implication—and we so assume—invalidated §§ 725.5 and 725.6 as well.

On July 1, 1974, Laws of Iowa 1974, cc. 1267 and 1268, became effective. These specifically repealed §§ 725.3, 725.5, and 725.6 of the 1973 Code. In addition, however, c. 1267 (thereafter codified as the first 10 sections of c. 725 of the 1975 Iowa Code) defined, among other things, "obscene material," and made it "a public offense" to disseminate obscene material to *minors* (defined as persons "under the age of eighteen"). Dissemination of obscene material to adults was not made criminal or even proscribed. Section 9 [2] of c. 1267 (now § 725.9 of the 1975 Code) insured that the law would be applied uniformly throughout the State, and that no lesser

---

[1] See also *State ex rel. Faches* v. *N. D. D., Inc.,* 228 N. W. 2d 191 (Iowa 1975) (State cannot enjoin the showing of certain movies under a statute relating to the use of premises "for the purpose of lewdness," when "lewdness" is not statutorily defined).

[2] "SEC. 9. . . . In order to provide for the uniform application of the provisions of this Act relating to obscene material applicable to minors within this state, it is intended that the sole and only regulation of obscene material shall be under the provisions of this Act, and no municipality, county or other governmental unit within this state shall make any law, ordinance or regulation relating to the availability of obscene materials. All such laws, ordinances or regulations, whether enacted before or after this Act, shall be or become void, unenforceable and of no effect upon the effective date of this Act" (July 1, 1974).

governmental unit would impose more stringent regulations on obscene material.

In 1976, the Iowa Legislature enacted a "complete revision" of the State's "substantive criminal laws." This is entitled the "Iowa Criminal Code" and is generally effective January 1, 1978. The existing definition of "obscene material" remains unchanged, but a new provision, § 2804 of the Criminal Code, Iowa Code Ann. (Spec. Pamphlet 1977), although limited in scope, applies by its terms to adults. It reads:

> "Any person who knowingly sells or offers for sale material depicting a sex act involving sado-masochistic abuse, excretory functions, a child, or bestiality which the average adult taking the material as a whole in applying contemporary community standards would find that it appeals to the prurient interest and is patently offensive; and the material, taken as a whole, lacks serious literary, scientific, political, or artistic value shall, upon conviction be guilty of a simple misdemeanor."

In summary, therefore, we have in Iowa (1) until 1973 state statutes that proscribed generally the dissemination of obscene writings and pictures; (2) the judicial nullification of some of those statutory provisions in that year for reasons of overbreadth and vagueness; (3) the enactment, effective July 1, 1974, of replacement obscenity statutes restricted in their application to dissemination to minors; and (4) the enactment in 1976 of a new Code, effective in 1978, with obscenity provisions, somewhat limited in scope, but not restricted in application to dissemination to minors.

Petitioner's mailings, described above and forming the basis of his federal prosecution, took place in 1974, *after* the theretofore existing Iowa statutes relating to obscene material had been nullified by *Wedelstedt*, but obviously *before* the 1976 legislation imposing misdemeanor liability with respect to certain transactions with adults becomes effective. Because

there is no contention that the materials petitioner mailed went to any minor, the 1974 legislation has no application to his case. And the 1976 legislation, of course, has no effect on petitioner's criminal liability. Cf. *Marks* v. *United States,* 430 U. S. 188 (1977).

Thus, what petitioner did clearly was not a violation of state law at the time he did it. It is to be observed, also, that there is no suggestion that petitioner's mailings went to any nonconsenting adult or that they were interstate.

## III

Petitioner was indicted on seven counts of violating 18 U. S. C. § 1461, which prohibits the mailing of obscene materials.[3] He pleaded not guilty. At the start of his trial petitioner proposed and submitted six questions for *voir dire.*[4]

---

[3] Section 1461 provides, in relevant part:

"Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance; . . .

.         .         .         .         .

"Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

"Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section . . . to be nonmailable, or knowingly causes to be delivered by mail according to the direction thereon . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense, and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter."

[4] Petitioner's proposed questions were:

"1. Are any members of the panel a member of or are in sympathy with any organization which has for its purpose the regulating or banning of alleged obscene materials?

"2. Will those jurors raise their hands who have any knowledge of the contemporary community standards existing in this federal judicial district relative to the depiction of sex and nudity in magazines and books?

"(The following individual questions are requested for each juror who answers the above question in the affirmative.)

The court accepted in substance and utilized the first question; this was designed to reveal whether any juror was connected with an organization devoted to regulating or banning obscene materials. The court declined to ask the other five. One of the questions made inquiry as to whether the jurors had any knowledge of contemporary community standards in the Southern District of Iowa with regard to the depiction of sex and nudity. Two sought to isolate the source of the jurors' knowledge and their understanding of those standards. The remaining two would have explored the jurors' knowledge of Iowa law on the subject.

At the trial the Government introduced into evidence the actual materials covered by the indictment. It offered nothing else on the issue of obscenity *vel non.* Petitioner did not testify. Instead, in defense, he introduced numerous sexually explicit materials that were available for purchase at "adult" bookstores in Des Moines and Davenport, Iowa, several advertisements from the Des Moines Register and Tribune, and a copy of what was then c. 725 of the Iowa Code, prohibiting the dissemination of "obscene material" only to minors. At the close of the Government's case, and again at the close of all the evidence, petitioner moved for a directed verdict of acquittal on the grounds, *inter alia,* that the Iowa obscenity statute, proscribing only the dissemination of obscene materials to minors, set forth the applicable community standard, and that the prosecution had not proved that the materials at issue offended that standard.

The District Court denied those motions and submitted the case to the jury. The court instructed the jury that contemporary community standards were set by what is in fact

---

"3. Where did you acquire such information?

"4. State what your understanding of those contemporary community standards are?

"5. In arriving at this understanding, did you take into consideration the laws of the State of Iowa which regulate obscenity?

"6. State what your understanding of those laws are?" App. 8.

accepted in the community as a whole. In making that determination, the jurors were entitled to draw on their own knowledge of the views of the average person in the community as well as the evidence presented as to the state law on obscenity and as to materials available for purchase. App. 22–23.

The jury found petitioner guilty on all seven counts. He was sentenced to concurrent three-year terms of imprisonment, all but three months of which were suspended, and three years' probation.

In his motion for a new trial, petitioner again asserted that Iowa law defined the community standard in a § 1461 prosecution. In denying this motion, the District Court held that § 1461 was "a federal law which neither incorporates nor depends upon the laws of the states," App. 33; the federal policy was simply different in this area. Furthermore, the court observed, Iowa's decision not to regulate distribution of obscene material did not mean that the people of Iowa necessarily "approve[d] of the permitted conduct," *ibid.;* whether they did was a question of fact for the jury. The court rejected petitioner's argument that it was error not to ask the jurors the question about the extent of their knowledge of contemporary community standards. It held that the jurors were entitled to draw on their own knowledge; *voir dire* on community standards would be no more appropriate than *voir dire* on the jurors' concept of "reasonableness." The court refused to hold that the Government was required to introduce evidence on a community standard in order to sustain its burden of proof. The materials introduced "can and do speak for themselves." *Id.,* at 34. The court did not address petitioner's vagueness point.[5]

The United States Court of Appeals for the Eighth Circuit,

---

[5] Despite the District Court's failure to discuss this point, we are satisfied that petitioner adequately preserved it for appellate review. See ¶ 7 of his motion for a new trial. App. 30.

by *per curiam* opinion, agreed with the District Court that the questions submitted by petitioner on community standards, except for the first, were impermissible, since they concerned the ultimate question of guilt or innocence rather than juror qualification. The court noted, however, that it was not holding that no questions whatsoever could be asked in that area. With respect to the effect of state law, the court held that the issue of offense to contemporary community standards was a federal question, and was to be determined by the jury in a federal prosecution. The court noted the admission of Iowa's obscenity statute into evidence but stated that this was designed to give the jury knowledge of the State's policy on obscenity when it determined the contemporary community standard. The state policy was not controlling, since the determination was for the jury. The conviction, therefore, was affirmed.

We granted certiorari in order to review the relationship between state legislation regulating or refusing to regulate the distribution of obscene material, and the determination of contemporary community standards in a federal prosecution. 426 U. S. 946 (1976).

## IV

The "basic guidelines" for the trier of fact in a state obscenity prosecution were set out in *Miller* v. *California* in the form of a three-part test:

> "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . . ; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U. S., at 24 (citations omitted).

In two companion cases, the Court held that the *Miller* standards were equally applicable to federal legislation. *United*

*States* v. *12 200-ft. Reels of Film,* 413 U. S. 123, 129–130 (1973) (importation of obscene material, 19 U. S. C. § 1305 (a)); *United States* v. *Orito,* 413 U. S. 139, 145 (1973) (movement of obscene material in interstate commerce, 18 U. S. C. § 1462). In *Hamling* v. *United States,* 418 U. S. 87 (1974), it held, specifically, that the *Miller* standards applied in a § 1461 prosecution.

The phrasing of the *Miller* test makes clear that contemporary community standards take on meaning only when they are considered with reference to the underlying questions of fact that must be resolved in an obscenity case.[6]  The test

---

[6] The phrase "contemporary community standards" was first used in *Roth* v. *United States,* 354 U. S. 476 (1957). See generally F. Schauer, The Law of Obscenity 116–135 (1976). The *Roth* Court explained the derivation and importance of the community standards test as follows:

"The early leading standard of obscenity allowed material to be judged merely by the effect of an isolated excerpt upon particularly susceptible persons. *Regina* v. *Hicklin,* [1868] L. R. 3 Q. B. 360. Some American courts adopted this standard but later decisions have rejected it and substituted this test: whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest. The *Hicklin* test, judging obscenity by the effect of isolated passages upon the most susceptible persons, might well encompass material legitimately treating with sex, and so it must be rejected as unconstitutionally restrictive of the freedoms of speech and press. On the other hand, the substituted standard provides safeguards adequate to withstand the charge of constitutional infirmity." 354 U. S., at 488–489 (footnotes omitted).

Although expressions in opinions vacillated somewhat before coming to the position that a national community standard was not constitutionally mandated, compare *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478, 488, and n. 10 (1962) (opinion of Harlan, J.), and *Jacobellis* v. *Ohio,* 378 U. S. 184, 195 (1964) (opinion of BRENNAN, J.), with *Miller* v. *California,* 413 U. S., at 30, the Court has never varied from the *Roth* position that the community as a whole should be the judge of obscenity, and not a small, atypical segment of the community. The only exception to this rule that has been recognized is for material aimed at a clearly defined deviant sexual group. *Mishkin* v. *New York,* 383 U. S. 502, 508 (1966). See *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 56 n. 6 (1973).

itself shows that appeal to the prurient interest is one such question of fact for the jury to resolve. The *Miller* opinion indicates that patent offensiveness is to be treated in the same way. 413 U. S., at 26, 30. See *Hamling* v. *United States,* 418 U. S., at 104–105.[7] The fact that the jury must measure patent offensiveness against contemporary community standards does not mean, however, that juror discretion in this area is to go unchecked. Both in *Hamling* and in *Jenkins* v. *Georgia,* 418 U. S. 153 (1974), the Court noted that part (b) of the *Miller* test contained a substantive component as well. The kinds of conduct that a jury would be permitted to label as "patently offensive" in a § 1461 prosecution are the "hard core" types of conduct suggested by the examples given in *Miller.*[8] See *Hamling* v. *United States,* 418 U. S., at 114; cf. *Jenkins* v. *Georgia,* 418 U. S., at 160–161. Literary, artistic, political, or scientific value, on the other hand, is not discussed in *Miller* in terms of contemporary community standards. See generally F. Schauer, The Law of Obscenity 123–124 (1976).

The issue we must resolve is whether the jury's discretion to determine what appeals to the prurient interest and what is patently offensive is circumscribed in any way by a state statute such as c. 725 of the Iowa Code. Put another way,

---

[7] See also *Jacobellis* v. *Ohio,* 378 U. S., at 191–192 (opinion of BRENNAN, J.); *Roth* v. *United States,* 354 U. S., at 487 n. 20; *United States* v. *Kennerley,* 209 F. 119, 121 (SDNY 1913) (L. Hand, J.) (obscenity should be determined in accordance with the "present critical point in the compromise between candor and shame at which the community may have arrived here and now"). Cf. *Manual Enterprises, Inc.* v. *Day,* 370 U. S., at 486 (opinion of Harlan, J.) (usually the elements of prurient interest and patent offensiveness will coalesce for this kind of material).

[8] The Court in *Miller* gave two "plain examples" of what a state statute could define for regulation:

"(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

"(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." 413 U. S., at 25.

we must decide whether the jury is entitled to rely on its own knowledge of community standards, or whether a state legislature (or a smaller legislative body) may declare what the community standards shall be, and, if such a declaration has been made, whether it is binding in a federal prosecution under § 1461.

Obviously, a state legislature would not be able to define contemporary community standards in a vacuum. Rather, community standards simply provide the measure against which the jury decides the questions of appeal to prurient interest and patent offensiveness. In *Hamling* v. *United States,* the Court recognized the close analogy between the function of "contemporary community standards" in obscenity cases and "reasonableness" in other cases:

"A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a 'reasonable' person in other areas of the law." 418 U. S., at 104–105.

It would be just as inappropriate for a legislature to attempt to freeze a jury to one definition of reasonableness as it would be for a legislature to try to define the contemporary community standard of appeal to prurient interest or patent offensiveness, if it were even possible for such a definition to be formulated.

This is not to say that state legislatures are completely foreclosed from enacting laws setting substantive limitations for obscenity cases. On the contrary, we have indicated on several occasions that legislation of this kind is permissible. See *Hamling* v. *United States,* 418 U. S., at 114; *Miller* v. *California,* 413 U. S., at 25. State legislation must still define the kinds of conduct that will be regulated by the State. For example, the Iowa law in effect at the time this prosecution was instituted was to the effect that no conduct aimed at

adults was regulated.[9]  At the other extreme, a State might seek to regulate all the hard-core pornography that it constitutionally could.  The new Iowa law, which will regulate only material "depicting a sex act involving sado-masochistic abuse, excretory functions, a child, or bestiality," provides an example of an intermediate approach.  Iowa Criminal Code § 2804.

If a State wished to adopt a slightly different approach to obscenity regulation, it might impose a geographic limit on the determination of community standards by defining the area from which the jury could be selected in an obscenity case, or by legislating with respect to the instructions that must be given to the jurors in such cases.  In addition, the State might add a geographic dimension to its regulation of obscenity through the device of zoning laws.  Cf. *Young v. American Mini Theatres, Inc.,* 427 U. S. 50 (1976).  It is evident that ample room is left for state legislation even though the question of the community standard to apply, when appeal to prurient interest and patent offensiveness are considered, is not one that can be defined legislatively.

An even stronger reason for holding that a state law regulating distribution of obscene material cannot define contemporary community standards in the case before us is the simple fact that this is a *federal* prosecution under § 1461. The Court already has held, in *Hamling,* that the substantive conduct encompassed by § 1461 is confined to "the sort of 'patently offensive representations or descriptions of that specific "hard core" sexual conduct given as examples in *Miller v. California.'* "  418 U. S., at 114.  The community standards aspects of § 1461 likewise present issues of federal law, upon which a state statute such as Iowa's cannot have con-

---

[9] See also *Paris Adult Theatre I* v. *Slaton,* 413 U. S., at 64 (the States are free to adopt a "laissez-faire" policy "and drop all controls on commercialized obscenity, if that is what they prefer"); *United States* v. *Reidel,* 402 U. S. 351, 357 (1971) (nonregulation of obscenity for adults "may prove to be the desirable and eventual legislative course").

clusive effect.[10]   The kinds of instructions that should be given to the jury are likewise a federal question.   For example, the Court has held that § 1461 embodies a requirement that local rather than national standards should be applied.[11]   *Hamling* v. *United States, supra.*   Similarly, obscenity is to be judged according to the average person in the community, rather than the most prudish or the most tolerant.   *Hamling* v. *United States, supra; Miller* v. *California, supra; Roth* v. *United States,* 354 U. S. 476 (1957).   Both of these substantive limitations are passed on to the jury in the form of instructions.

---

[10] The language of § 1461 gives no indication that Congress intended to adopt state laws relating to distribution of obscene material for purposes of the federal statute, nor does its history.   See n. 12, *infra.*   Furthermore, none of the usual reasons advanced in favor of such adoption are present here.   The regulation of the mails is a matter of particular federal concern, and the nationwide character of the postal system argues in favor of a nationally uniform construction of § 1461.   The Constitution itself recognizes this fact, in the specific grant to Congress of power over the postal system.   Art. I, § 8, cl. 7.   Obscenity in general has been a matter of both national and local concern.   To the extent that local concern is relevant, however, the jurors' application of contemporary community standards fully satisfies that interest.   Finally, to the extent that the state law and the federal law conflict, traditional principles of federal supremacy require us to follow the federal policy.   See *Clearfield Trust Co.* v. *United States,* 318 U. S. 363 (1943); *United States* v. *Standard Oil Co.,* 332 U. S. 301 (1947); *DeSylva* v. *Ballentine,* 351 U. S. 570 (1956); *United States* v. *Little Lake Misere Land Co.,* 412 U. S. 580 (1973).   See generally Comment, Adopting State Law as the Federal Rule of Decision: A Proposed Test, 43 U. Chi. L. Rev. 823 (1976).   We therefore decline petitioner's invitation to adopt state law relating to distribution for purposes of the federal statute regulating use of the mails.

[11] It is to be noted that *Miller* held only that the States could not be compelled to adopt a national standard.   413 U. S., at 30.   If a state legislature decided that it wanted a national community standard for purposes of instructing state juries, or if Congress amended the federal legislation in such a way as to require reference to a national standard, a different question would be presented.   We express no view upon any such question.

The fact that the mailings in this case were wholly intrastate is immaterial for a prosecution under § 1461. That statute was one enacted under Congress' postal power, granted in Art. I, § 8, cl. 7, of the Constitution, and the Postal Power Clause does not distinguish between interstate and intrastate matters. This Court consistently has upheld Congress' exercise of that power to exclude from the mails materials that are judged to be obscene. See, e. g., *Ex parte Jackson*, 96 U. S. 727, 736 (1878); *Public Clearing House* v. *Coyne*, 194 U. S. 497, 507–508 (1904) (power to exclude from the mail "information of a character calculated to debauch the public morality"); *Roth* v. *United States, supra; United States* v. *Reidel*, 402 U. S. 351 (1971). See also *In re Rapier*, 143 U. S. 110 (1892).[12]

Our decision that contemporary community standards must be applied by juries in accordance with their own understanding of the tolerance of the average person in their community does not mean, as has been suggested, that obscenity convictions will be virtually unreviewable. We have stressed before that juries must be instructed properly, so that they consider the entire community and not simply their own subjective reactions, or the reactions of a sensitive or of a callous minority. See *Miller* v. *California*, 413 U. S., at 30. The type of conduct depicted must fall within the substantive limitations suggested in *Miller* and adopted in *Hamling* with respect to § 1461. Cf. *Jenkins* v. *Georgia*, 418 U. S. 153 (1974). The work also must lack serious literary, artistic, political, or scientific value before a conviction will be upheld; this determination is particularly amenable to appellate review. Finally, it

---

[12] For a detailed summary of the history of § 1461, see generally *Manual Enterprises, Inc.* v. *Day*, 370 U. S., at 500–511 (opinion of BRENNAN, J.); Cairns, Paul, & Wishner, Sex Censorship: The Assumptions of Anti-Obscenity Laws and the Empirical Evidence, 46 Minn. L. Rev. 1009, 1010–1011, n. 2 (1962); Paul, The Post Office and Non-Mailability of Obscenity: An Historical Note, 8 UCLA L. Rev. 44 (1961); Schauer, *supra*, n. 6, at 8–29.

is always appropriate for the appellate court to review the sufficiency of the evidence. Cf. *Ginzburg* v. *United States,* 383 U. S. 463 (1966).

Petitioner argues that a decision to ignore the Iowa law will have the practical effect of nullifying that law. We do not agree. In the first place, the significance of Iowa's decision in 1974 not to regulate the distribution of obscene materials to adults is open to question. Iowa may have decided that the resources of its prosecutors' offices should be devoted to matters deemed to have greater priority than the enforcement of obscenity statutes. Such a decision would not mean that Iowa affirmatively desired free distribution of those materials; on the contrary, it would be consistent with a hope or expectation on the State's part that the Federal Government's prosecutions under statutes such as § 1461 would be sufficient for the State's purposes. The State might also view distribution over the counter as different from distribution through the mails. It might conclude that it is easier to keep obscene materials out of the hands of minors and unconsenting adults in retail establishments than it is when a letter or package arrives at a private residence. Furthermore, the history of the Iowa law suggests that the State may have left distribution to consenting adults unregulated simply because it was not then able to arrive at a compromise statute for the regulation of obscenity.

Arguments similar to petitioner's "nullification" thesis were made in cases that followed *Stanley* v. *Georgia,* 394 U. S. 557 (1969). In *United States* v. *12 200-ft. Reels of Film,* 413 U. S. 123 (1973), the question was whether the United States constitutionally might prohibit the importation of obscene material that was intended solely for private, personal use and possession. See 19 U. S. C. § 1305 (a). *Stanley* had upheld the individual's right to possess obscene material in the home, and the argument was made that this right would be virtually meaningless if the Government could prevent impor-

tation of, and hence access to, the obscene material. 413 U. S., at 126–127. The Court held that *Stanley* had been based on the privacy of the home, and that it represented a considered line of demarcation in the obscenity area. *Id.*, at 127. Consequently, despite the incidental effect that the importation prohibition had on the privacy right to possess obscene material in the home, the Court upheld the statute. A similar result was reached, in the face of similar argument, in *United States* v. *Orito,* 413 U. S. 139 (1973). There, 18 U. S. C. § 1462, the statute prohibiting knowing transportation of obscene material in interstate commerce, was at issue. The Court held that *Stanley* did not create a right to receive, transport, or distribute obscene material, even though it had established the right to possess the material in the privacy of the home. 413 U. S., at 141. See also *United States* v. *Reidel, supra.*

In this case, petitioner argues that the Court has recognized the right of States to adopt a laissez-faire attitude toward regulation of pornography, and that a holding that § 1461 permits a federal prosecution will render the States' right meaningless. See *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 64 (1973); *United States* v. *Reidel,* 402 U. S., at 357. Just as the individual's right to possess obscene material in the privacy of his home, however, did not create a correlative right to receive, transport, or distribute the material, the State's right to abolish all regulation of obscene material does not create a correlative right to force the Federal Government to allow the mails or the channels of interstate or foreign commerce to be used for the purpose of sending obscene material into the permissive State.

Even though the State's law is not conclusive with regard to the attitudes of the local community on obscenity, nothing we have said is designed to imply that the Iowa statute should not have been introduced into evidence at petitioner's trial. On the contrary, the local statute on obscenity provides rele-

vant evidence of the mores of the community whose legislative body enacted the law. It is quite appropriate, therefore, for the jury to be told of the law and to give such weight to the expression of the State's policy on distribution as the jury feels it deserves. We hold only that the Iowa statute is not conclusive as to the issues of contemporary community standards for appeal to the prurient interest and patent offensiveness. Those are questions for the jury to decide, in its traditional role as factfinder. *United States* v. *Danley,* 523 F. 2d 369 (CA9 1975), cert. denied, 424 U. S. 929 (1976).

## V

A. We also reject petitioner's arguments that the prospective jurors should have been asked about their understanding of Iowa's community standards and Iowa law, and that § 1461 was unconstitutionally vague as applied to him. The particular inquiries requested by petitioner would not have elicited useful information about the jurors' qualifications to apply contemporary community standards in an objective way. A request for the jurors' description of their understanding of community standards would have been no more appropriate than a request for a description of the meaning of "reasonableness." Neither term lends itself to precise definition. This is not to preclude other more specific and less conclusory questions for *voir dire.* For example, it might be helpful to know how long a juror has been a member of the community, how heavily the juror has been involved in the community, and with what organizations having an interest in the regulation of obscenity the juror has been affiliated. The propriety of a particular question is a decision for the trial court to make in the first instance. In this case, however, we cannot say that the District Court abused its discretion in refusing to ask the specific questions tendered by petitioner.

B. Neither do we find § 1461 unconstitutionally vague as applied here. Our construction of the statute flows directly

from the decisions in *Hamling, Miller, Reidel,* and *Roth.* As construed in *Hamling,* the type of conduct covered by the statute can be ascertained with sufficient ease to avoid due process pitfalls. Similarly, the possibility that different juries might reach different conclusions as to the same material does not render the statute unconstitutional. *Roth* v. *United States,* 354 U. S., at 492 n. 30; *Miller* v. *California,* 413 U. S., at 26 n. 9. We find no vagueness defect in the statute attributable to the fact that federal policy with regard to distribution of obscene material through the mail was different from Iowa policy with regard to the intrastate sale of like material.

## VI

Since the Iowa law on obscenity was introduced into evidence, and the jurors were told that they could consider it as evidence of the community standard, petitioner received everything to which he was entitled. To go further, and to make the state law conclusive on the issues of appeal to prurient interest and patent offensiveness, in a federal prosecution under § 1461, would be inconsistent with our prior cases. We hold that those issues are fact questions for the jury, to be judged in light of the jurors' understanding of contemporary community standards. We also hold that § 1461 is not unconstitutionally vague as so applied, and that petitioner's proposed *voir dire* questions were not improperly refused.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

Mr. Justice Powell, concurring.

I join the Court's opinion and write to express my understanding of the relative narrowness of the questions presented.

At the time petitioner engaged in the conduct at issue here, Iowa law placed no limits on the distribution of obscene materials to adults. If Iowa law governs in this federal

prosecution, petitioner's conviction must be reversed. Our decision therefore turns on the answers to two questions, one requiring interpretation of a federal statute, the other calling for application of the constitutional standards announced in *Miller* v. *California,* 413 U. S. 15 (1973).

The first question, easily answered, is whether Congress intended to incorporate state obscenity statutes into 18 U. S. C. § 1461. I agree with the Court's opinion, *ante,* at 303–304, and n. 10, that no such intent existed.

The federal statute goes to the constitutional limit, reaching all pornographic materials not protected under the First Amendment. See *Marks* v. *United States,* 430 U. S. 188, 195 (1977). Under *Miller* local community standards play an important role in defining that limit. The second question, therefore, is whether "community standards," as that concept is used in *Miller,* necessarily follow changes in a State's statutory law. Again, I agree with the Court's conclusion that they do not. A community may still judge that materials are patently offensive and that they appeal to the prurient interest even though its legislature has chosen, for whatever reason, not to apply state criminal sanctions to those who distribute them. The state statute is relevant evidence of evolving community standards, and it was properly brought to the attention of the jury here. But it is not controlling in a prosecution under federal law.

I emphasize, however, that this case presents no question concerning the limits on a State's power to design its obscenity statutes as it sees fit or to define community standards as it chooses for purposes of applying *its own* laws. Within the boundaries staked out by *Miller,* the States retain broad latitude in this respect.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join, dissenting.

Petitioner was convicted after a jury trial in the United States District Court for the Southern District of Iowa of

mailing obscene material in violation of 18 U. S. C. § 1461. The Court of Appeals for the Eighth Circuit affirmed.

I would reverse. I have previously stated my view that this statute is " 'clearly overbroad and unconstitutional on its face,' " see, *e. g., Millican* v. *United States,* 418 U. S. 947, 948 (1974) (dissenting from denial of certiorari), quoting *United States* v. *Orito,* 413 U. S. 139, 148 (1973) (dissenting opinion).

MR. JUSTICE STEVENS, dissenting.

Petitioner has been sentenced to prison for violating a federal statute enacted in 1873.[1] In response to a request, he mailed certain pictures and writings from one place in Iowa to another. The transaction itself offended no one [2] and violated no Iowa law. Nevertheless, because the materials proved "offensive" to third parties who were not intended to see them, a federal crime was committed.

Although the Court's affirmance of this conviction represents a logical extension of recent developments in this area of the law, it sharply points up the need for a principled re-examination of the premises on which it rests. Because so much has already been written in this area, I shall merely endeavor to identify certain weaknesses in the Court's "offensiveness" touchstone [3] and then to explain why I believe

---

[1] 17 Stat. 598, 18 U. S. C. § 1461. The statute "was passed with less than an hour of Congressional debate, and there was no objection to its enactment in either the House or the Senate. Reflecting its origin, the law is still known as the Comstock Act." F. Schauer, The Law of Obscenity 13 (1976).

[2] It is, of course, possible that the postal inspectors, who had used fictitious names to request the materials, were offended by them. There was, however, no such testimony. Moreover, persons examining materials of this kind as a part of their routine duties must surely develop an insensitivity to them.

[3] Although appeal to the "prurient" interest and "patently offensive" character are identified as separate parts of the legal standard for determining whether materials are obscene, the two concepts overlap to some extent. But whether or not the two standards are different, sexually

criminal prosecutions are an unacceptable method of abating a public nuisance which is entitled to at least a modicum of First Amendment protection.

# I

A federal statute defining a criminal offense should prescribe a uniform standard applicable throughout the country. This proposition is so obvious that it was not even questioned during the first 90 years of enforcement of the Comstock Act under which petitioner was prosecuted.[4] When the reach of the statute is limited by a constitutional provision, it is even more certain that national uniformity is appropriate.[5] Nevertheless, in 1963, when Mr. Chief Justice Warren concluded that

oriented material is constitutionally protected if it is not patently offensive.

[4] In 1962, Mr. Justice Harlan wrote:

"There must first be decided the relevant 'community' in terms of whose standards of decency the issue must be judged. We think that the proper test under this federal statute, reaching as it does to all parts of the United States whose population reflects many different ethnic and cultural backgrounds, is a national standard of decency. We need not decide whether Congress could constitutionally prescribe a lesser geographical framework for judging this issue which would not have the intolerable consequence of denying some sections of the country access to material, there deemed acceptable, which in others might be considered offensive to prevailing community standards of decency." *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478, 488 (footnote omitted).

[5] As MR. JUSTICE BRENNAN has written:

"It is true that local communities throughout the land are in fact diverse, and that in cases such as this one the Court is confronted with the task of reconciling the rights of such communities with the rights of individuals. Communities vary, however, in many respects other than their toleration of alleged obscenity, and such variances have never been considered to require or justify a varying standard for application of the Federal Constitution. The Court has regularly been compelled, in reviewing criminal convictions challenged under the Due Process Clause of the Fourteenth Amendment, to reconcile the conflicting rights of the local community which brought the prosecution and of the individual defendant. Such a task is admittedly difficult and delicate, but it is inherent in the Court's duty of determining whether a particular conviction worked

a national standard for judging obscenity was not provable, he suggested the substitution of community standards as an acceptable alternative.[6] He thereby planted the seed which eventually blossomed into holdings such as *Miller*,[7] *Hamling*,[8] and today's pronouncement that the relevant standard "is not one than can be defined legislatively." *Ante*, at 303.

The conclusion that a uniformly administered national standard is incapable of definition or administration is an insufficient reason for authorizing the federal courts to engage in ad hoc adjudication of criminal cases. Quite the contrary, it is a reason for questioning the suitability of criminal prosecution as the mechanism for regulating the distribution of erotic material.

The most significant reasons for the failure to define a national standard for obscenity apply with equal force to the use of local standards. Even the most articulate craftsman finds it easier to rely on subjective reaction rather than concrete descriptive criteria as a primary definitional source.[9] The diversity within the Nation which makes a single standard of offensiveness impossible to identify is also present within each of the so-called local communities in which litigation of this

---

a deprivation of rights guaranteed by the Federal Constitution. The Court has not shrunk from discharging that duty in other areas, and we see no reason why it should do so here. The Court has explicitly refused to tolerate a result whereby 'the constivutional limits of free expression in the Nation would vary with state lines,' *Pennekamp* v. *Florida, supra,* 328 U. S., at 335; we see even less justification for allowing such limits to vary with town or county lines. We thus reaffirm the position taken in *Roth* to the effect that the constitutional status of an allegedly obscene work must be determined on the basis of a national standard. It is, after all, a national Constitution we are expounding." *Jacobellis* v. *Ohio*, 378 U. S. 184, 194–195 (footnote omitted).

[6] *Id.*, at 200–201 (dissenting opinion).

[7] *Miller* v. *California*, 413 U. S. 15.

[8] *Hamling* v. *United States*, 418 U. S. 87.

[9] Mr. Justice Stewart, concurring in *Jacobellis* v. *Ohio, supra,* at 197, wrote that criminal prosecution in the obscenity area is constitution-

kind is prosecuted.[10]    Indeed, in *Miller* itself, the jury was asked to apply the contemporary community standard of California.   A more culturally diverse State of the Union hardly can exist, and yet its standard for judging obscenity was assumed to be more readily ascertainable than a national standard.

Indeed, in some ways the community standard concept is even more objectionable than a national standard.   As we have seen in prior cases, the geographic boundaries of the relevant community are not easily defined, and sometimes appear to be subject to elastic adjustment to suit the needs of the

---

ally limited to prosecution of "hard-core pornography."   He went on to note:

"I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so.   But I know it when I see it, and the motion picture involved in this case is not that."

[10] The opinion in *Miller, supra,* at 30–31, assumes that jurors could more easily "draw on the standards of their community" than some "hypothetical and unascertainable 'national standar[d].'" Yet, that assumption can only relate to isolated communities where jurors are well enough acquainted with members of their community to know their private tastes and values.   The assumption does not apply to most segments of our diverse, mobile, metropolitan society.   For surely, the standard for a metropolitan area is just as "hypothetical and unascertainable" as any national standard.   For a juror, it would be almost as hard to determine the community standard for any large urban area as it would be to determine a national standard.   Metropolitan areas typically contain some commercial districts devoted to the exploitation of sex, in bookshops, adult theaters, nightclubs, or burlesque houses; a juror might have seen respectable citizens frequenting the entertainments of such areas and therefore conclude that the community standard was one of "anything goes."   Another juror might predicate his standard on residential enclaves which include nothing even closely resembling an adult bookstore, and decide that such an area reflects the proper standard.   Under that test, the juror would probably conclude that any magazine sold from under the local drugstore counter must be obscene because its presence on the magazine rack might offend customers.   A third juror might try to apply a hybrid standard.

prosecutor.[11] Moreover, although a substantial body of evidence and decisional law concerning the content of a national standard could have evolved through its consistent use, the derivation of the relevant community standard for each of our countless communities is necessarily dependent on the perceptions of the individuals who happen to compose the jury in a given case.

The question of offensiveness to community standards, whether national or local, is not one that the average juror can be expected to answer with evenhanded consistency. The average juror may well have one reaction to sexually oriented materials in a completely private setting and an entirely different reaction in a social context. Studies have shown that an opinion held by a large majority of a group concerning a neutral and objective subject has a significant impact in distorting the perceptions of group members who would normally take a different position.[12] Since obscenity is by no means a neutral subject, and since the ascertainment of a community standard is such a subjective task, the expression of individual jurors' sentiments will inevitably influence the perceptions of other jurors, particularly those who would normally be in the minority.[13] Moreover, because the record

[11] See Hamling v. United States, supra, at 142–145 (BRENNAN, J., dissenting); United States v. McManus, 535 F. 2d 460 (CA8 1976), cert. denied, 429 U. S. 1052. Edelstein & Mott, Collateral Problems in Obscenity Regulation: A Uniform Approach to Prior Restraints, Community Standards and Judgment Preclusion, 7 Seton Hall L. Rev. 543, 566–571 (1976).

[12] Rosenblatt & Rosenblatt, Six Member Juries in Criminal Cases: Legal and Psychological Considerations, 47 St. John's L. Rev. 615, 631–632 (1973); Asch, Effects of Group Pressure upon the Modification and Distortion of Judgments, reprinted in D. Cartwright, Group Dynamics 189–200 (1960).

[13] A juror might well find certain materials appealing and yet be unwilling to say so. He may assume, without necessarily being correct, that his reaction is aberrant and at odds with the prevailing community view,

never discloses the obscenity standards which the jurors actually apply, their decisions in these cases are effectively unreviewable by an appellate court.[14] In the final analysis, the guilt or innocence of a criminal defendant in an obscenity trial is determined primarily by individual jurors' subjective reactions to the materials in question rather than by the predictable application of rules of law.

This conclusion is especially troubling because the same image—whether created by words, sounds, or pictures—may produce such a wide variety of reactions. As Mr. Justice Harlan noted: "[It is] often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because government officials [or jurors] cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." *Cohen* v. *California,* 403 U. S. 15, 25. In my judgment, the line between communications which "offend" and those which do not is too blurred to identify criminal conduct. It is also too blurred to delimit the protections of the First Amendment.

---

especially if the first members of the jury to speak indicate that they consider the material offensive. Perhaps one reason that the Comstock Act was passed unanimously, see n. 1, *supra,* is that it is much more popular to be against sin than to be tolerant of it.

[14] The introduction of evidence on the question of contemporary community standards will rarely enable an appellate judge to differentiate between the jurors' own reactions to the materials in question and the reactions of the average resident of the community. For instance, in the present case, the defendant entered into evidence as exhibits materials which were freely and lawfully available at stores in Iowa. These exhibits were more salacious, lewd, and open in their treatment of sex than were the materials upon which the defendants were convicted. Yet a reviewing court could not use this evidence to overturn a jury verdict, for the jury's view may quite correctly have been that these materials, although freely available, were appreciated only by a deviant minority of the community and did not conform to the community standard. Testimony of experts would have to be similarly discounted.

## II

Although the variable nature of a standard dependent on local community attitudes is critically defective when used to define a federal crime, that very flexibility is a desirable feature of a civil rule designed to protect the individual's right to select the kind of environment in which he wants to live.

In his dissent in *Jacobellis* v. *Ohio,* 378 U. S. 184, Mr. Chief Justice Warren reminded us that obscene material "may be proscribed in a number of ways," *id.,* at 201, and that a lesser standard of review is required in civil cases than in criminal. Moreover, he identified a third dimension in the obscenity determination that is ignored in the Court's current formulation of the standard:

> "In my opinion, the use to which various materials are put—not just the words and pictures themselves—must be considered in determining whether or not the materials are obscene. A technical or legal treatise on pornography may well be inoffensive under most circumstances but, at the same time, 'obscene' in the extreme when sold or displayed to children." *Ibid.* (footnote omitted).

The standard now applied by the Court focuses its attention on the content of the materials and their impact on the average person in the community. But that impact is not a constant; it may vary widely with the use to which the materials are put. As Mr. Justice Sutherland wrote in a different context, a "nuisance may be merely a right thing in the wrong place,—like a pig in the parlor instead of the barnyard." [15] Whether a pig or a picture is offensive is a question that cannot be answered in the abstract.

In *Roth* v. *United States,* 354 U. S. 476, 485, the Court held "that obscenity is not within the area of constitutionally protected speech or press." That holding rests, in part, on

---

[15] *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 388.

the assumed premise that all communications within the protected area are equally immune from governmental restraint, whereas those outside that area are utterly without social value and, hence, deserving of no protection. Last Term the Court expressly rejected that premise. *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 66–71; *Virginia Pharmacy Bd.* v. *Virginia Consumer Council,* 425 U. S. 748, 771–773. The fact that speech is protected by the First Amendment does not mean that it is wholly immune from state regulation. Although offensive or misleading statements in a political oration cannot be censored, offensive language in a courtroom [16] or misleading representations in a securities prospectus may surely be regulated. Nuisances such as sound trucks [17] and erotic displays in a residential area may be abated under appropriately flexible civil standards even though the First Amendment provides a shield against criminal prosecution.

As long as the government does not totally suppress protected speech and is faithful to its paramount obligation of complete neutrality with respect to the point of view expressed in a protected communication, I see no reason why regulation of certain types of communication may not take into account obvious differences in subject matter. See *Lehman* v. *City of Shaker Heights,* 418 U. S. 298. It seems to me ridiculous to assume that no regulation of the display of sexually oriented material is permissible unless the same regula-

---

[16] In deciding what comments on litigation may be punished, the content of the comment, whether it is uttered inside or outside the courtroom, and whether it concerns pending litigation, all have relevance. See *In re Little,* 404 U. S. 553; *Pennekamp* v. *Florida,* 328 U. S. 331; *Bridges* v. *California,* 314 U. S. 252. See also *In re Dellinger,* 502 F. 2d 813, 815 (CA7 1974), cert. denied *sub nom. Dellinger* v. *United States,* 420 U. S. 990; *Theriault* v. *United States,* 481 F. 2d 1193, 1196 (CA5 1973), cert. denied, 414 U. S. 1114. Such factors are always relevant in applying the clear-and-present-danger test: Only the combination of content (the word "fire") and place (a crowded theater) allows prohibition in Mr. Justice Holmes' famous example, *Schenck* v. *United States,* 249 U. S. 47, 52.

[17] See *Saia* v. *New York.* 334 U. S. 558; *Kovacs* v. *Cooper,* 336 U. S. 77.

tion could be applied to political comment.[18]   On the other hand, I am not prepared to rely on either the average citizen's understanding of an amorphous community standard or on my fellow judges' appraisal of what has serious artistic merit as a basis for deciding what one citizen may communicate to another by appropriate means.[19]

I do not know whether the ugly[20] pictures in this record have any beneficial value.   The fact that there is a large demand for comparable materials indicates that they do pro-

---

[18] This assumption must underlie the suggestion in *Miller* that a national standard would require that "the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City."   413 U. S., at 32 (footnote omitted).   That suggestion misreads the First Amendment in at least two ways.   The constitutional protection of the speaker's right to communicate does not deprive the local community of all authority to regulate the time, place, and manner of communication; Nevada's approval of public displays would not necessarily require Maine or Mississippi to approve use of identical means of expression.   More fundamentally, the constitutional inquiry is not confined to the question of what an unwilling recipient must accept; rather, the critical First Amendment question in this kind of case involves the interested individual's right of access to materials he desires.   See the passage from *Kleindienst* v. *Mandel,* 408 U. S. 753, 762–763, quoted in *Virginia Pharmacy Bd.* v. *Virginia Consumer Council,* 425 U. S. 748, 757, which recognizes that the First Amendment necessarily protects the right to "receive information and ideas."

[19] As Mr. Justice Douglas once noted: "The First Amendment makes confidence in the common sense of our people and in their maturity of judgment the great postulate of our democracy."   *Dennis* v. *United States,* 341 U. S. 494, 590 (dissenting opinion).

[20] If First Amendment protection is properly denied to materials that are "patently offensive" to the average citizen, I question whether the element of erotic appeal is of critical importance.   For the average person may find some portrayals of violence, of disease, or of intimate bodily functions (such as the birth of a child) equally offensive—at least when they are viewed for the first time.   It is noteworthy that one of the examples of an unprotected representation identified by the Court, *ante,* at 301 n. 8, surely would have no erotic appeal to the average person.

vide amusement or information, or at least satisfy the curiosity of interested persons.[21] Moreover, there are serious well-intentioned people who are persuaded that they serve a worthwhile purpose.[22] Others believe they arouse passions that lead to the commission of crimes; if that be true, surely there is a mountain of material just within the protected zone that is equally capable of motivating comparable conduct.[23] Moreover, the dire predictions about the baneful effects of these

[21] As Mr. Justice Harlan wrote in *Cohen* v. *California*, 403 U. S. 15, 25–26:

"Additionally, we cannot overlook the fact . . . that much linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated."

To a similar effect, this Court wrote in *Winters* v. *New York*, 333 U. S. 507, 510:

"We do not accede to appellee's suggestion that the constitutional protection for a free press applies only to the exposition of ideas. The line between the informing and the entertaining is too elusive for the protection of that basic right. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine. Though we can see nothing of any possible value to society in these magazines, they are as much entitled to the protection of free speech as the best of literature."

[22] See the Final Report of the President's Commission on Obscenity and Pornography (1970).

[23] Anthony Comstock, who is given credit for the enactment of the statute involved in this case, understood this point. He wrote: " 'No embellishment of art can rob lust of its power for evil upon the human nature,' " J. Kilpatrick, The Smut Peddlers 42 (1960). According to Professor Schauer "[a]mong the objects of Comstock's scorn were light literature, pool halls, lotteries, gambling dens, popular magazines, and weekly newspapers. Artistic motive was irrelevant." The Law of Obscenity 12 n. 51 (1976).

materials are disturbingly reminiscent of arguments formerly made about the availability of what are now valued as works of art. In the end, I believe we must rely on the capacity of the free marketplace of ideas to distinguish that which is useful or beautiful from that which is ugly or worthless.[24]

In this case the petitioner's communications were intended to offend no one. He could hardly anticipate that they would offend the person who requested them. And delivery in sealed envelopes prevented any offense to unwilling third parties. Since his acts did not even constitute a nuisance, it necessarily follows, in my opinion, that they cannot provide the basis for a criminal prosecution.

I respectfully dissent.

---

[24] Mr. Justice Holmes has written:

"[W]hen men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution." *Abrams* v. *United States,* 250 U. S. 616, 630 (dissenting opinion).