MAGILL, Circuit Judge.
 

 Robert Easley, Jr., and Jacquelyn Hunter appeal their convictions for mailing obscene materials in violation of 18 U.S.C. §§ 2, 1461 (1988). On appeal they challenge the district court’s
 
 [1]
 
 obscenity instructions, the facial validity of 18 U.S.C. § 1461, and the government’s prosecutions in general. We affirm.
 

 I.
 

 The appellants, Robert Easley, Jr., and Jacquelyn Hunter, were, respectively, the owner and manager of Diverse Industries, Inc., a California corporation. Diverse Industries was a mail order purveyor of sexually explicit videocassettes and magazines.
 
 [2]
 
 Postal Inspector William Morris, responding to advertisements mailed by Diverse Industries, ordered various movies and magazines on four different occasions. Inspector Morris used a fake name and a post office box return address when ordering the items. Diverse Industries mailed the materials to Inspector Morris in Minnesota.
 

 Based on the material in these four mailings, a grand jury indicted Hunter and Easley on four counts of violating 18 U.S.C. §§ 2, 1461.
 
 [3]
 
 Specifically, they were indicted for aiding and abetting the mailing of nonmailable material on November 13, 1987; November 19, 1987; December 1, 1987; and March 18, 1988. The jury found Hunter and Easley guilty on all counts. Easley was sentenced to four concurrent twelve-month terms of imprisonment, three years of supervised release, a $30,200 fine, and 300 hours of community service. Hunter was sentenced to four concurrent four-month terms of imprisonment, two years of supervised release, a $200 special assessment, and 300 hours of community service.
 

 II.
 

 Easley and Hunter raise numerous issues in their consolidated appeals. For simplicity’s sake, these issues are divided into three categories: challenges to the jury instructions on obscenity; a challenge to the facial validity of 18 U.S.C. § 1461; and challenges to the government’s prosecutions in general.
 

 A.
 
 Jury Instructions
 

 To address Easley’s and Hunter’s challenges to the jury instructions, it is necessary to first review briefly the analysis the factfinder uses to determine whether sexually explicit material is obscene: (1) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; (2) whether the average person, applying contemporary community standards, would find that the work depicts or describes, in a patently offensive way, specified sexual conduct; and (3) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.
 
 Miller v. California,
 
 413 U.S. 15, 24, 30, 93 S.Ct. 2607, 2615, 2618, 37 L.Ed.2d 419 (1973). Easley and Hunter argue that several of the district court’s jury instructions concerning this analysis are erroneous.
 

 
 *1445
 
 1. Consenting Adults
 

 Hunter first argues that the district court erred in excluding evidence that the materials were intended only for consenting adults and by instructing the jury to disregard any evidence to that effect. At trial, Hunter tried to present evidence that Diverse Industries’ mailed advertisement, which Inspector Morris used to place his orders, was enclosed within a second, inner envelope that informed the recipient that sexually oriented material was inside. The government sought to exclude the evidence on the ground that it related to a “consenting adult defense,” which the Supreme Court has expressly prohibited.
 
 See Paris Adult Theater I v. Slaton,
 
 413 U.S. 49, 57, 93 S.Ct. 2628, 2635, 37 L.Ed.2d 446 (1973) (“We categorically disapprove the theory, apparently adopted by the trial judge, that obscene, pornographic films acquire constitutional immunity from state regulation simply because they are exhibited for consenting adults only.”). Hunter argues that the district court erred in accepting this argument because the evidence was not offered to establish the consenting adult defense, but to show that the ordered materials were not patently offensive.
 

 Hunter argues that the envelope with the warning is relevant to patent offensiveness because the context in which sexually explicit material is presented may affect a juror’s view of the offensiveness of the material. For example, Hunter argues, a person might find a sexually explicit billboard offensive, but might not find offensive the same scene in a movie viewed at home. Part of the context in this ease, Hunter contends, is that the mailed materials were sent only to adults who wanted them.
 

 Hunter makes the same argument with respect to the district court’s instruction: “[I]t is not a defense to the crimes charged in the indictment that defendants may have sold these materials to adults who willingly purchased them,
 
 and it should not in any way be a part of your deliberation in this case
 
 ” (emphasis added). Hunter contests the emphasized portion of the instruction, arguing that the district court, “by instructing the jury that it could not consider the fact of an consenting-adults-only audience ... allowed the jury to evaluate the ‘patent offensiveness’ question under a presumption of child or unwilling adult recipients.” Appellant Hunter’s Brief at 10.
 

 The gist of Hunter’s argument is that although the fact that sexually explicit materials were distributed to consenting adults is not a complete defense to an obscenity prosecution, it is a factor in determining whether the materials are patently offensive. The logical implication of this novel argument is that the district court erred in not allowing the jury to consider the circumstances of the materials’ distribution.
 

 In making this argument, Hunter relies principally on
 
 Hamling v. United States,
 
 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), and
 
 Ginzburg v. United States,
 
 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966).
 
 Ginzburg
 
 involved the prosecution of a corporation and its owner for violating 18 U.S.C. § 1461. The Supreme Court explicitly noted that to determine obscenity, normally only the allegedly obscene publications were necessary. 383 U.S. at 465, 86 S.Ct. at 944. In
 
 Ginzburg,
 
 however, the government had “charged the offense in the context of the circumstances of production, sale, and publicity and assumed that, standing alone, the publications themselves might not be obscene.”
 
 Id.
 
 In response to the government’s charge, the Court stated: “We agree that the question of obscenity may include consideration of the setting in which the publications were presented as an aid to determining the question of ob-scenity_”
 
 Id.
 
 at 465-66, 86 S.Ct. at 944-45. The Court later stated: “We perceive no threat to First Amendment guarantees in thus holding that in close cases evidence of pandering may be probative with respect to the nature of the material....”
 
 Id.
 
 at 474, 86 S.Ct. at 949.
 

 In
 
 Hamling,
 
 the Supreme Court approved an instruction that informed the jurors that if they found the obscenity determination to be close, they could also consider “whether the materials had been pandered, by looking to their ‘[mjanner of
 
 *1446
 
 distribution, circumstances of production, sale, ... [and] advertising.’ ” 418 U.S. at 130, 94 S.Ct. at 2914.
 

 For a number of reasons, these cases do not support Hunter’s argument that the district court erred by not allowing the jury to consider evidence that only consenting adults received the material. First, the Court has approved the use of evidence of “context” only when the government has alleged pandering. In this case, the government made no such claim. Furthermore, such context evidence has only been accepted as a sort of aggravating factor in the obscenity determination, and not as a mitigating factor, as Hunter asks us to hold. Second, even when approving the use of such evidence, the Court has stated only that it “may” or “could” be considered, not that it must be. Therefore, the fact that such evidence was not allowed is not a ground for reversal unless the district court abused its discretion. On the record before us, no such abuse exists. Finally, the Court has approved the use of such evidence only in “close” cases. Hunter does not argue that the obscenity determinations in this case were close
 
 [4]
 
 and we refuse to speculate on the issue. Therefore, the district court did not err in its instruction or in refusing to admit the evidence.
 

 2. Accept or Tolerate
 

 Hunter next argues that the trial court erroneously instructed the jury that patent offensiveness is to be measured by what the adult community will accept, rather than tolerate. The district court’s instruction to the jury on patent offensiveness stated:
 

 The second prong to be applied in determining whether material is obscene, is whether it depicts or describes sexual conduct in a patently offensive way. Examples of sexual conduct would include ultimate sexual acts, normal or perverted, actual or simulated; masturbation; excretory functions or lewd exhibition of the genitals. In making this judgment, you must measure whether the material is patently offensive by contemporary community standards; that is, whether it so exceeds the limits of what the adult community will
 
 accept
 
 as to be patently offensive.
 

 Instruction 35 (emphasis added).
 

 Hunter argues that the Supreme Court’s decisions in
 
 Smith v. California,
 
 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), and
 
 Smith v. United States,
 
 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977), require that patent offensiveness be measured by what the adult community will tolerate, not what it will accept. In
 
 Smith v. California,
 
 Justice Harlan stated: “[T]he Fourteenth Amendment does not permit a conviction ... unless the work complained of is found substantially to exceed the limits of candor set by contemporary community standards. The community cannot ... condemn that which it generally tolerates.” 361 U.S. at 171, 80 S.Ct. at 228 (Harlan, J., concurring in part and dissenting in part; footnotes omitted). This statement, however, is not part of the majority opinion and is mere dictum within Justice Harlan’s separate opinion. In
 
 Smith v. United States,
 
 the Court observed that “contemporary community standards must be applied by juries in accordance with their own understanding of the tolerance of the average person in their community.” 431 U.S. at 305, 97 S.Ct. at 1766. The problem with Hunter’s reliance on
 
 Smith v. United States
 
 is that that opinion involved a jury instruction stating that “contemporary community standards were set by what is in fact
 
 accepted
 
 in the community as a whole,”
 
 id.
 
 at 297-98, 97 S.Ct. at 1761-62 (emphasis added); this instruction was never challenged and the Court never addressed it. It seems likely that the Court in
 
 Smith v. United States
 
 viewed “tolerate” and “accept” as synonymous, and thus Hunter cannot rely on this case for the proposition that the district court erred in refusing to use “tolerate” instead of “accept.”
 
 See also New York v. Ferber,
 
 458 U.S. 747, 761 n. 12, 102 S.Ct. 3348, 3357 n. 12, 73 L.Ed.2d 1113 (1982) (using “accept” and “toleration” in the same footnote);
 
 *1447
 

 Miller,
 
 413 U.S. at 32, 93 S.Ct. at 2619 (“It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City.”).
 

 Other circuits have similarly rejected the argument that “tolerate” must be used in the definition of patent offensiveness.
 
 See United States v. Pryba,
 
 900 F.2d 748, 759 (4th Cir.) (“To take the word ‘tolerance’ out of one sentence in
 
 Smith
 
 and insist that it be used as the test for contemporary community standards misreads the opinion.”),
 
 cert. denied,
 
 — U.S. -, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990);
 
 Hoover v. Byrd,
 
 801 F.2d 740, 742 (5th Cir.1986) (rejecting the argument that “community standards of toleration” was the only constitutionally correct formulation of the patent offensiveness definition);
 
 United States v. Battista,
 
 646 F.2d 237, 245-46 (6th Cir.) (characterizing the argument as “misplaced”),
 
 cert. denied sub nom. Peraino v. United States,
 
 454 U.S. 1046, 102 S.Ct. 586, 70 L.Ed.2d 488 (1981);
 
 see also United States v. Petrov,
 
 747 F.2d 824, 831 (2d Cir.1984) (“A key issue in any obscenity case is the degree of community acceptance or tolerance of materials similar to those at issue.”), ce
 
 rt. denied,
 
 471 U.S. 1025, 105 S.Ct. 2037, 85 L.Ed.2d 318 (1985).
 

 Hunter’s argument is without any relevant case support.
 
 [5]
 
 Therefore, the district court’s instruction was not erroneous.
 

 3. Lasciviousness
 

 Hunter argues that the district court erred in using the word “lascivious” to define “prurient interest.” The district court’s instruction to the jury on prurient interest states, in pertinent part: “An appeal to the prurient interest is an appeal to the unhealthy, abnormal,
 
 lascivious,
 
 shameful, or morbid interest in sex as distinguished from a normal and healthy interest in sex.” Instruction 33 (emphasis added).
 

 Hunter relies on
 
 Brockett v. Spokane Arcades, Inc.,
 
 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985), for the proposition that using “lasciviousness” to define prurient interest was erroneous. In
 
 Brockett,
 
 the Supreme Court reversed a lower court’s ruling that struck a state obscenity statute for overbreadth. The state statute at issue defined “prurient” as “that which incites lasciviousness or lust.”
 
 Id.
 
 at 494, 105 S.Ct. at 2797. The Ninth Circuit struck the entire obscenity statute for over-breadth, believing that “lust” also reached material that stimulated normal sexual responses and thus was constitutionally protected.
 
 Id.
 
 at 495, 105 S.Ct. at 2797. The Supreme Court reversed the circuit court’s invalidation of the statute, believing that its overbreadth could be cured by excising the word lust: “[I]t is equally certain that if the statute at issue here is invalidated only insofar as the word ‘lust’ is taken to include normal interest in sex, the statute would pass constitutional muster.”
 
 Id.
 
 at 504-05, 105 S.Ct. at 2802-03.
 

 Hunter argues that just as “lust” has lost most of its negative connotation, so has “lascivious,” and that they refer primarily to “mere arousal of normal sexual interests.” Hunter relies on dictionary definitions of “lascivious” to illustrate that word’s applicability to normal sexual desires. We believe, however, that
 
 Brockett
 
 has foreclosed this question. The Supreme Court expressly stated in that case that lasciviousness was an appropriate definition of prurient interest: “Furthermore, had the Court of Appeals thought that ‘lust’ refers
 
 only
 
 to normal sexual appetites, it could have excised the word from the statute entirely, since the statutory definition of prurience referred to ‘lasciviousness’ as well as ‘lust.’ ”
 
 Id.
 
 at 505, 105 S.Ct. at 2802 (emphasis in original);
 
 see also Vernon Beigay, Inc. v. Traxler,
 
 790 F.2d 1088, 1094 (4th Cir.1986) (stating that the Supreme Court has recognized “lewd” and “lascivious” as proper definitions of prurient interest). We do not believe that
 
 *1448
 
 in the six years since
 
 Brockett
 
 was decided, the meaning of lascivious has changed such that it now describes primarily normal sexual interests. Therefore, the district court’s instruction was proper.
 

 4. Normal and Healthy Interest in Sex
 

 Hunter also challenges Instruction 33 for requiring the jury to determine whether the materials appealed to the prurient interest rather than a “normal
 
 and
 
 healthy” interest in sex. Hunter argues that the government’s burden to prove appeal to prurient interest was lessened because to be found non-obscene, the materials had to appeal to both a normal
 
 and
 
 a healthy interest in sex. Hunter contends that
 
 Brockett
 
 requires that the material appeal only to a normal interest in sex, not a normal and healthy interest. This argument is without merit.
 
 Brockett
 
 clearly states that non-obscene material provokes “only normal, healthy sexual desires.” 472 U.S. at 498, 105 S.Ct. at 2799. The district court’s instruction is consistent with this language.
 

 5. Appeal to Average Adult Person
 

 Easley challenges another of the district court’s instructions on prurient interest. The district court instructed the jury: “If the predominant appeal of the materials in question here, taken as a whole, is an appeal to the normal interest in sex of the average adult person, the jury must acquit the accused.” Instruction 34. Easley argues that the district court erred in rejecting his proposed jury instruction:
 

 In determining whether the material involved in this case appeals to a prurient interest in sex, you must judge this material with reference to its appeal, or lack thereof, to the average adult person in Minnesota.
 

 If you believe that the government has failed to prove beyond a reasonable doubt that the charged materials appeal to the shameful or morbid interest in sex of the average adult person in the state of Minnesota, you must find the Defendants not guilty.
 

 At trial, Easley objected to Instruction 34 because it did not state that to convict the defendants, the jury had to find that the material appealed to the prurient interest of the average adult person. The district court believed that Instruction 34 combined with Instruction 33 satisfied Easley’s concerns. Instruction 33 states, in relevant part: “In the first part of the test to determine whether material is obscene, you must decide whether the average adult person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest.”
 

 Easley argued at trial and now argues on appeal that this court’s decision in
 
 United States v. Treatman,
 
 524 F.2d 320 (8th Cir.1975), requires that the court instruct the jury that it must evaluate the material with respect to its prurient appeal to the average adult member of the community. In
 
 Treatman,
 
 this court held erroneous a district court’s supplemental instruction concerning prurient interest. The main instruction in that case stated that the material “must be measured by its appeal to the average American adult.”
 
 Id.
 
 at 322. After the jury asked the judge whether the material must appeal to the majority of average adults or merely to some of the average adults, the judge informed them that there was no requirement that the material appeal to the majority of the average adults in the community.
 
 Id.
 
 This court observed that the jury clearly “did not understand that the prurient interest of the average adult must be measured by the synthesis of the entire community.”
 
 Id.
 
 at 323. We held that the district court’s supplemental instruction was erroneous because it implied that the material only need appeal to “some” of the average people.
 
 Id.
 

 We hold that the district court in this case did not err in rejecting Easley’s proffered instruction. The only functional difference between Easley’s proposed instruction and Instructions 33 and 34 is that Instruction 33 does not end “... appeals to the prurient interest
 
 of the average adult person in Minnesota.”
 
 It would be redundant for a court to instruct the jury that to
 
 *1449
 
 satisfy the first part of the obscenity test it must determine whether the average person, applying contemporary community standards, would find that the material appeals to the prurient interest of the average person. In making the prurient interest finding, the jury is essentially stepping into the shoes of the average person.
 
 Treatman
 
 merely stands for the proposition that when stepping into these shoes, the jury steps into the shoes of a “composite or synthesis of the community,” not “the majority, or a few, or some.” 524 F.2d at 323. Instructions 33 and 34 clearly show that the jury was to view the material in the light of the average person. The court explained this average person in Instruction 31, which states: “In deciding whether the material as a whole appeals to the prurient interest ... the jury must evaluate what judgment would be made by a hypothetical average person applying the collective view of the adult community.” Therefore, the district court did not err in rejecting Easley’s proffered instruction.
 

 6. Lack of Community Standards
 

 Easley next argues that the district court erred in rejecting his proposed jury instruction that if the jury could not determine the community standards for the state, the defendants must be acquitted. At trial, Easley objected to Instruction 32, which states:
 

 Contemporary community standards are set by what is in fact accepted in the community as a whole; that is to say, by the adult society at large or adult people in general; and not by what some persons or groups of persons may believe the community as a whole ought to accept or refuse to accept. It is a matter of common knowledge that customs change and that the community as a whole may find acceptable at one time, that which was formerly unacceptable. The community as a whole may also find presently acceptable that which some particular group of the population may regard as unacceptable.
 

 In determining contemporary community standards, the jury may consider what, as shown by the evidence in the case, appears in contemporary magazines, books, newspapers, television, motion pictures, novels and other media of communication which are freely available in the community as a whole.
 

 The “community” you must consider in deciding these questions is the District of Minnesota — in other words, the entire State of Minnesota. You must decide how the average adult person would apply the contemporary adult community standards existing within the state.
 

 Easley argues that because the jury might possibly have been unable to determine the contemporary community standards, he was entitled to the following clarifying instruction: “If you feel you are unable to determine the community standards of the District of Minnesota, and that the Government has failed to offer proof beyond a reasonable doubt of the relevant community standards, then you must find the Defendants not guilty.”
 

 Easley proffers no relevant case support for the proposition that a jury must be instructed that if it cannot determine the community standards, it must acquit the defendants.
 
 [6]
 
 He cites
 
 United States v. Various Articles of Obscene Merchandise,
 
 709 F.2d 132, 135 (2d Cir.1983), and
 
 United States v. 2,200 Paper Back Books,
 
 565 F.2d 566 (9th Cir.1977), for the proposition that if a community standard cannot be determined, then the defendant must be acquitted. That proposition is true insofar as it applies to those eases, but does not help Easley here. In both of the cases, the trier of fact was the district court judge. In
 
 2,200 Paper Back Books,
 
 the circuit court noted: “While ordinarily we anticipate that a jury or judge is in a position to determine the community standard even without testimony on that issue, we are presented here with the unique circumstance where a judge was unable to do so.” 565 F.2d at 571 n. 8. The judge in
 
 2,200
 
 
 *1450
 

 Paper Back Books
 
 informed the government of his inability to determine community standards, which made it incumbent on the government to provide evidence of the standards.
 
 Id.
 
 The Ninth Circuit held that the government failed to do so and thus did not meet its burden of proof.
 
 Id.
 

 The Second Circuit in
 
 Various Articles
 
 explained that to “arrive at a measure of community tolerance of pornographic material the trial judge may rely on his own experience in the community and decide as best he can what most people seem to think about such materials.” 709 F.2d at 136. The court continued, “If, on the other hand, he has little or no knowledge of their views, he may turn to opinion proof, and if the government fails to offer such proof, he may be relegated to finding that it has failed to sustain its burden.”
 
 Id.
 

 Neither of these cases support Easley’s proposition that a court must instruct the jury that if it cannot determine community standards, the jury must acquit the defendant. Therefore, the district court did not err in rejecting an instruction to which Easley was not entitled. Moreover, there is no evidence in the record before us showing that the jury in this case had any problem determining the community standards. It seems unlikely that such a case would ever arise. As the Supreme Court observed in
 
 Hamling:
 
 “A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a ‘reasonable’ person in other areas of the law.” 418 U.S. at 104-05, 94 S.Ct. at 2900-01. Easley and Hunter both called expert witnesses on the issue of community standards, and their counsel discussed it at length in closing arguments. The jury instead relied on its own knowledge of community standards, which it was entitled to do, to find the materials obscene.
 

 B.
 
 Challenges to 18 U.S.C. § 1461
 

 Hunter next challenges the statute under which she was convicted, 18 U.S.C. § 1461.
 
 See supra
 
 n. 3. Hunter contends that the statute is facially invalid because it is over-broad and impermissibly chills speech. To succeed on her overbreadth claim, Hunter must show that § 1461 reaches constitutional conduct.
 
 See Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,
 
 455 U.S. 489, 497, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). Because the Supreme Court has expressly held that obscene material is not constitutionally protected,
 
 see, e.g., Miller,
 
 413 U.S. at 23, 93 S.Ct. at 2614, and because the statute only applies to obscene material, Hunter’s over-breadth challenge fails.
 

 Hunter also argues that the unpredictability of prosecution under § 1461, its vague definition of obscenity, its weak scienter requirement, and its harsh penalties all create an impermissible regime of self-censorship. These arguments are utterly without legal merit and are better addressed to Congress because the Supreme Court has already rejected them.
 
 See Hamling,
 
 418 U.S. at 123, 94 S.Ct. at 2910;
 
 Roth v. United States,
 
 354 U.S. 476, 491-92, 77 S.Ct. 1304, 1312-13, 1 L.Ed.2d 1498 (1957).
 

 C.
 
 The Prosecutions
 

 Hunter and Easley both challenge their prosecutions and convictions in more general terms as well. Most of their specific claims arise from the circumstances of their prosecutions. Hunter and Easley allege, and the government does not dispute, that their prosecutions resulted from the government’s “Project PostPorn.” This law enforcement technique features “a series of multidistrict indictments against distributors of sexually oriented materials.”
 
 PHE, Inc. v. United States Dep’t of Justice,
 
 743 F.Supp. 15, 19-20 (D.D.C.1990). The project is “a cooperative effort between the Department of Justice and the Postal Inspection Service and constitute^] the first nationwide effort to identify and prosecute violators of federal laws prohibiting the use of the mails to advertise and distribute obscene materials.”
 
 Id.
 
 Hunter and Easley were indicted first in Bellevue, Washington, then in Duluth, Minnesota,
 
 *1451
 
 and finally in Louisville, Kentucky. They moved to dismiss the indictments in Duluth on various grounds. The district court rejected their motions and they now argue that this was error.
 

 1. Double Jeopardy
 

 Hunter and Easley first argue that the district court erred in refusing to dismiss their indictments because the successive prosecutions violated the double jeopardy clause of the fifth amendment, which provides that no person shall “be subject for the same offense to be twice put in jeopardy.” U.S. Const, amend. V.
 

 Hunter and Easley argue that because they were indicted in Washington for aiding and abetting the mailing of obscene material before they were indicted in Minnesota for the same crime, the Minnesota indictments should have been dismissed. They argue that because their underlying conduct, namely, their involvement with Diverse Industries, was the same in both prosecutions, the double jeopardy clause bars the Minnesota prosecutions.
 

 The Supreme Court’s recent decision in
 
 Grady v. Corbin,
 
 — U.S. -, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), controls our analysis of this claim. The Supreme Court in
 
 Grady
 
 stated that the first step in a double jeopardy analysis is to determine whether
 
 Blockburger v. United States,
 
 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), disposes of the claim. Under
 
 Blockburger,
 
 the double jeopardy clause bars “successive prosecutions for the same criminal act or transaction under two criminal statutes whenever each statute does not ‘requir[e] proof of a fact which the other does not.’ ”
 
 Grady,
 
 110 S.Ct. at 2087 (quoting
 
 Blockburger,
 
 284 U.S. at 304, 52 S.Ct. at 182). The
 
 Grady
 
 Court stated: “If application of that test reveals that the offenses have identical statutory elements or that one is a lesser included offense of the other, then the inquiry must cease, and the subsequent prosecution is barred.”
 
 Id.
 
 110 S.Ct. at 2090.
 

 Blockburger
 
 does not bar the successive prosecutions of Hunter and Easley. As the Fifth Circuit concluded in
 
 United States v. Linetsky,
 
 533 F.2d 192 (5th Cir.1976), on essentially the same facts present in the case before us:
 

 While the counts at issue in the [successive] indictments are rooted in the same statutory provisions, charge the same substantive violation, and involve mailings of the same allegedly obscene material, factual identity is lacking with respect to the overt acts. The similar counts in the two indictments involve not only different addresses but also different mailings which are temporally and geographically distinct.
 

 Id.
 
 at 197;
 
 accord United States v. Toushin,
 
 714 F.Supp. 1452, 1459-60 (M.D.Tenn. 1989) (following
 
 Linetsky).
 

 Under
 
 Grady,
 
 the second step in a double jeopardy analysis goes beyond
 
 Block-burger:
 

 Thus, a subsequent prosecution must do more than merely survive the
 
 Blockburger
 
 test. As we suggested in
 
 [Illinois v. Vitale,
 
 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980) ], the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted .... The critical inquiry is what conduct the State will prove, not the evidence the State will use to prove that conduct. As we have held, the presentation of specific evidence in one trial does not forever prevent the government from introducing that same evidence in a subsequent proceeding.... On the other hand, a State cannot avoid the dictates of the Double Jeopardy Clause merely by altering in successive prosecutions the evidence offered to prove the same conduct.
 

 Id.
 
 110 S.Ct. at 2093 (footnote omitted).
 

 Hunter and Easley argue that
 
 Grady’s
 
 focus on previously charged conduct that becomes constitutionally off-limits in subsequent prosecutions points up the district court’s error here. The Minnesota indictments offend the double jeopardy clause, their argument runs, because their conduct
 
 *1452
 
 in supervising Diverse Industries was essentially the same for both the Washington and Minnesota indictments. The appellants’ argument stumbles, however, on the facts of their crimes. These two indictments charge the same kind of conduct; they do not charge the same conduct. The Washington bill charged Hunter and Eas-ley with using, or aiding the use of, the mail to distribute obscene material in October 1987. The Minnesota indictment charged them with committing the same crime on four different occasions: twice in November 1987, once in December 1987, and once in March 1988. In both cases, the appellants’ aid came from managing Diverse Industries. In each case, however, that aid—their crime for purposes of 18 U.S.C. §§ 2, 1461—came at different times. That difference in time makes Hunter’s and Easley’s conduct legally different. The Minnesota indictment, therefore, did not require the government to “prove conduct that constitutes an offense for which the defendants] ha[ve] already been prosecuted.”
 
 Grady,
 
 110 S.Ct. at 2093. Because the appellants were not prosecuted in Kentucky until after the Minnesota prosecutions were completed, those proceedings are not relevant to this appeal. The constitutional effect, if any, of the Washington and Minnesota prosecutions on the later Kentucky prosecutions is not before us. We accordingly express no opinion on that point.
 

 Because the Minnesota prosecutions of Hunter and Easley required the proof of facts not present in the Washington prosecutions and because the Minnesota prosecutions did not involve conduct for which they had already been prosecuted, the double jeopardy clause does not bar the successive prosecutions.
 
 [7]
 

 2. First Amendment
 

 Hunter also argues that the district court erred in not dismissing her indictment because the government’s successive prosecutions violate her first amendment rights. She argues in general that “Project Post Porn” will result in “chok[ing] off the mail ing of all constitutionally protected erotica’ because of the vagueness of the
 
 Millei
 
 analysis. Hunter’s argument essentially asks this court to overrule
 
 Miller.
 
 This is a challenge we are unable, as well as un willing, to accept.
 

 3. Harassment
 

 Finally, Hunter and Easley argue that the district court should have dis missed the indictments because the government’s successive prosecutions constituted harassment in violation of the fifth amendment. They rely primarily on
 
 PHE, Inc. v. United States Dep’t of Justice,
 
 743 F.Supp. 15 (D.D.C.1990). In
 
 PHE,
 
 the government, after searching the distributor’s premises, threatened to prosecute the distributor in multiple federal jurisdictions unless it agreed to curtail its business anc stop distributing sexually explicit materials, including materials the governmenl knew were not obscene. The governmenl repeatedly made this threat, and engaged in other conduct as well, leading the distributor to seek an injunction against the government.
 
 Id.
 
 at 18-20. On these facts, the district court found harassment and granted PHE a preliminary injunction prohibiting the Justice Department from returning indictments against the distributor in more than one federal district.
 
 Id.
 
 at 25-27.
 

 The case before us is clearly distinguishable from
 
 PHE.
 
 Here, the
 
 government
 
 did not repeatedly threaten Hunter and Easley with multiple prosecutions. Neither did the government attempt to suppress Diverse Industries’ distribution of materials the government knew were not obscene. The harassment found in
 
 PHE
 
 is simply not present in the case before us.
 

 Hunter and Easley, in essence, argue that they were unconstitutionally harassed because the government ordered their materials and then prosecuted them in multiple jurisdictions. This argument fails be
 
 *1453
 
 cause the use of postal inspectors to order sexually explicit material is not improper,
 
 see Smith v. United States,
 
 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977), and 18 U.S.C. § 1461 clearly makes
 
 each
 
 mailing of obscene material a crime.
 

 The fundamental problem with Hunter’s and Easley’s harassment claims is that they seek to place the responsibility for their current predicaments on an intolerant, crafty government. The true locus of the responsibility, however, is squarely on their own shoulders. Hunter and Easley knew they were distributing sexually explicit material. They also knew those materials were subject to the community standards of ninety-three different federal districts. They even maintained a list of areas where they thought their material would be considered obscene. Unfortunately for them, Minnesota was not on that list. As Hunter admits, due to this “error in perception,” Diverse is out of business. Appellant Hunter’s Brief at 5. This same error in perception also resulted in their prosecutions and subsequent convictions. Hunter and Easley thus have no one to blame but themselves.
 

 III.
 

 For the foregoing reasons, Hunter’s and Easley’s convictions for violating 18 U.S.C. §§ 2, 1461 are affirmed.
 

 [1]
 

 . The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.
 

 [2]
 

 . The current status of Diverse Industries is somewhat unclear from the record. At some time before trial, Easley sold the company to Hunter. Hunter now claims that Diverse is out of business.
 

 [3]
 

 . 18 U.S.C. § 2(a) states: “Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."
 

 Section 1461 states, in pertinent part: "Every obscene ... article, matter, thing, device or substance ... [i]s declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier. Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section ... to be non-mailable ... shall be fined ... or imprisoned ... or both.... ”
 

 [4]
 

 . Hunter does note that the jury found one magazine and one video not obscene.
 

 [5]
 

 . Hunter also relies on two state court cases,
 
 State ex rel. Collins v. Superior Court, 787
 
 P.2d 1042 (Ariz.1986), and
 
 Leach v. American Booksellers Ass’n, Inc.,
 
 582 S.W.2d 738 (Tenn.1978), that are neither persuasive nor binding on this court.
 

 [6]
 

 . Easley again relies primarily on two state court cases,
 
 State v. Kam,
 
 68 Haw. 631, 726 P.2d 263 (1986), and
 
 Commonwealth v. Trainor,
 
 374 Mass. 796, 374 N.E.2d 1216 (1978), that are neither binding on this court nor persuasive in their reasoning.
 

 [7]
 

 . Easley also argues that the Minnesota indictment should have been dismissed because the government fragmented a single conspiracy into multiple conspiracies in violation of the double jeopardy clause. This argument is without merit. The government charged Easley and Hunter with conspiracy only in the Kentucky indictment. All other charges were for the substantive offense of aiding and abetting in the mailing of obscene matter.