**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert Joe Garcia EASLEY, Jr.,
Defendant–Appellant.**

No. 90–5751.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 7, 1990.

Decided Aug. 22, 1991.

Joseph M. Whittle, U.S. Atty., Terry Cushing, Asst. U.S. Atty. (argued and briefed), Louisville, Ky., Carl Alexandre, Office of the U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Arthur M. Schwartz (argued and briefed), Denver, Colo., for defendant-appellant.

Before MERRITT, Chief Judge, JONES, Circuit Judge, and WELLFORD, Senior Circuit Judge.*

NATHANIEL R. JONES, Circuit Judge.

Defendant-appellant Robert Joe Garcia Easley, Jr., appeals his jury conviction for three counts of mailing obscene materials in violation of 18 U.S.C. § 1461 and one count of using a common carrier to ship obscene materials in interstate commerce in violation of 18 U.S.C. § 1462. For the reasons that follow, we reverse and remand for new trial.

## I.

On January 24, 1989, a federal grand jury indictment was returned in the Western District of Kentucky charging Easley and two co-defendants, Jacqueline Hunter and Diverse Industries, Inc. ("Diverse"), with five counts involving use of the mails and a common carrier to ship obscene materials. This was the third indictment filed against Easley and his co-defendants charging use of the mails or common carri-

ers to transport obscene materials.[1] The other two indictments were filed in the Eastern District of Washington on June 15, 1988 and in the District of Minnesota on December 21, 1988. In Washington, Easley, Hunter and Diverse were prosecuted on a three-count indictment for mailing obscene materials. Easley pled guilty to one count on the condition that the other two counts against him would be dropped and that all counts against defendants Hunter and Diverse would be dropped. This plea was entered on January 9, 1989. In Minnesota, the same defendants were indicted on four counts of sending obscene materials through the mails. It appears Easley was convicted on all counts.[2]

All of the indictments against Easley arose out of a postal investigation of Diverse. Based upon advertising materials either sent by Diverse or turned over to the Postal Service by citizens, Postal Inspectors using fictitious names ordered various magazines and video tapes from Diverse. In relation to the charges in Kentucky, Postal Inspector Gary Kinney ordered four different sets of magazines and videotapes from Diverse. Three of these orders were mailed to a post office box in Hardin County, Kentucky. One of the orders was telephoned in to Diverse, shipped by United Parcel Service and picked up at the UPS terminal in Louisville, Kentucky. Similar investigations and orders were being solicited by other Postal Inspectors in different geographic locations which resulted in the indictments in Washington and Minnesota.

Using the evidence collected around the country, the Postal Inspectors obtained a warrant to search Diverse's offices in Van Nuys, California. It was executed on February 28, 1988, and a number of items and documents were seized. Among these were notes in Easley's handwriting which matched the printed descriptions of material in Diverse's advertisements. There was

---

\* The Honorable Harry W. Wellford assumed senior status on January 21, 1991.

1. The Kentucky indictment added for the first time a charge of conspiracy to ship obscene materials, in addition to the substantive charges for the mailings.

2. Though the record is not clear as to whether Easley was convicted in Minnesota, his counsel indicated as much at oral argument.

also a folder marked "4–Play Video" which contained invoices and purchase orders addressed to Diverse and marked "Attention: Robert J." In Easley's office inspectors found and seized a corporate tax return for 1986 which lists Easley's name as the only corporate officer of Diverse. Easley's office also contained advertising material, both from his own company and from other mail order companies, as well as other sexually explicit material, material concerning Diverse's business, a videotape machine and a large screen monitor. During the search several employees were served with grand jury subpoenas and were ultimately compelled to testify at trial.

Prior to his trial in Kentucky, Easley filed a motion to dismiss the indictment alleging that his prosecution violated double jeopardy principles and constituted harassment. The trial court dismissed Easley's motion as "devoid of merit" and scheduled the case for trial.

Trial began on December 4, 1989. As in both the prior prosecutions, the government's case consisted of demonstrating Easley's responsibility for the individual mailings by demonstrating his control of Diverse. In each case, the prosecution used evidence seized from the Diverse offices in California, along with the physical evidence of the mailings and testimony of Diverse employees to convict. Testimony from employees of Diverse revealed that Diverse was in the business of selling adult products by mail including videotapes and magazines. Employees also testified that Easley was the president of Diverse and that he directly supervised the company's art department, which was responsible for creating Diverse's advertising brochures. Easley also conducted staff meetings in his office, which was the largest and nicest in the suite, and he signed refund checks and other checks paying Diverse's bills. Easley also received copies of Diverse's deposit slips whenever a deposit was made.

On December 11, the government rested its case and the defense moved for acquittal. The trial court denied defense counsel's motion. The defense then rested without putting on witnesses, again moved for acquittal and again was denied. After two days of deliberations, an eleven-member jury acquitted Easley on the conspiracy count and convicted him on the four substantive counts of sending obscene materials through the mails or by common carrier.

## II.

Easley's first contention is that his prosecution in several districts for mailing obscene materials violates his rights under the double jeopardy clause of the fifth amendment. Until recently, a double jeopardy claim raised by an accused as a bar to a subsequent prosecution was analyzed under the test articulated in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). In *Blockburger,* the Supreme Court held that, "the test to be applied to determine whether there are two offenses or only one [for double jeopardy purposes], is whether each provision requires proof of a fact which the other does not." *Id.* at 304, 52 S.Ct. at 182. In other words, courts were required to determine, by analyzing the facts to be proved, whether the defendant was being prosecuted twice for the same offense.

Recently, in *Grady v. Corbin,* —— U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the Supreme Court expanded the focus of double jeopardy analysis in subsequent prosecution cases. Under *Grady,* such cases are to be analyzed in two steps. The first step incorporates the *Blockburger* analysis:

> To determine whether a subsequent prosecution is barred by the Double Jeopardy Clause, a court must first apply the traditional *Blockburger* test. If the application of that test reveals that the offenses have identical statutory elements or that one is a lesser included offense of the other, then the inquiry must cease, and the subsequent prosecution is barred.

*Grady,* 110 S.Ct. at 2090. The Court goes on to describe the second step of the analysis as follows:

> [A] subsequent prosecution must do more than merely survive the *Blockburger* test. As we suggested in [*Illinois v.*

*Vitale,* 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980) ], the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted. This is not an "actual evidence" or "same evidence" test. The critical inquiry is what conduct the State will prove, not the evidence the State will use to prove that conduct. As we have held, the presentation of specific evidence in one trial does not forever prevent the government from introducing that same evidence in a subsequent proceeding. See *Dowling v. United States,* [493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) ].

*Grady* at 2093 (footnotes omitted). As we understand this second prong of the *Grady* test, it operates in essence as the reverse of the lesser included offense rule. In other words, a defendant may not be prosecuted in a subsequent proceeding for an offense which incorporates all the same conduct as part of its essential elements as an offense charged in the first prosecution.

The application of this rule in practice is clarified by looking to the facts in *Grady.* In *Grady,* the defendant, while driving intoxicated, hit another car, killing one person and injuring another. While in the hospital, the defendant was served with two traffic violations—one for driving intoxicated and the other for failing to keep right of the median. The defendant appeared in traffic court on the traffic violations and pled guilty. He was fined $350.00 and had his license revoked for six months. Two months later, a grand jury indicted the defendant for manslaughter and other related offenses. The defendant objected to the indictment arguing that the subsequent prosecution would violate the double jeopardy clause. The Supreme Court agreed, finding a double jeopardy violation because the government would have to establish the same conduct elements from the prior prosecution, including drunk driving and failing to stay right of the median, to prove the negligence and recklessness elements of the manslaughter

charges. The Court did add, however, that the subsequent prosecution for manslaughter could have gone forward without violating the double jeopardy clause had the government sought to prove different conduct, such as driving too fast in storm conditions, to establish the requisite negligence or recklessness. *See Grady,* 110 S.Ct. at 2094.

The Supreme Court's decision in *Grady,* does not substantially alter this court's precedent interpreting the requirements of the double jeopardy clause in subsequent prosecutions. In 1980, just after the Supreme Court modified the *Blockburger* test in *Vitale,* our court explained the nature of those modifications in an opinion by Judge Merritt in *Pandelli v. United States,* 635 F.2d 533, 538 (6th Cir.1980). In *Pandelli,* we stated that courts must look to the theory of criminal liability underlying the prosecution's case rather than looking abstractly at the statutes to be applied.

> What the reviewing court must now do in applying *Blockburger* is go further and look to the *legal theory of the case or the elements of the specific criminal cause of action for which the defendant was convicted* without examining the facts in detail.

*Id.* The Supreme Court in *Grady* directs us to make substantially the same inquiry as that described by Judge Merritt in *Pandelli.*

Applying *Grady* to the facts before us, we must decide as to each count in the Kentucky indictment, first, whether the count charges an offense which passes muster under the *Blockburger* test, and second, whether the conduct the government will prove in that count constitutes the "same conduct" as the conduct proved by the government in a prior prosecution. We will first address Counts 2 through 5 of the indictment which charged Easley with mailing or shipping obscene material into Kentucky. In our view Easley's subsequent prosecution on these counts does not run afoul of the double jeopardy clause.

Easley asserts that his alleged criminal conduct was sending or shipping obscene materials. The fact that some of these

materials went to Washington, some to Minnesota and some to Kentucky does not change the fact that his alleged conduct, shipping or causing these materials to be shipped, was the same in each case. Thus, Easley argues that under *Grady*, the government is required to prosecute him for all of his dealings with obscene materials in a single proceeding. We find that Easley misapprehends the requirements of *Grady*.

First, it is well-established that each mailing is a separate violation of the federal obscenity statutes. *See, e.g. Hamling v. United States*, 418 U.S. 87, 100–01, 94 S.Ct. 2887, 2898–99, 41 L.Ed.2d 590 (1974) (in which the charge of mailing an advertisement for a book was considered separate and apart from charge for mailing the book itself); *United States v. Ross*, 205 F.2d 619, 620 (10th Cir.1953) (defendants charged with 82 separate counts of mailing obscene materials); *Freedberg v. U.S. Dep't of Justice*, 703 F.Supp. 107 (D.D.C.1988) (each mailing of obscene material is a separate offense both in the jurisdiction in which it is mailed and in the jurisdiction where it is received). This position is strengthened by the fact that Congress specifically amended 18 U.S.C. § 1461 to provide for prosecutions in the areas affected by the materials:

> The purpose of the Bill, as amended is to make it possible to prosecute violators of section 1461 of Title 18 of the United States Code not only at the place at which the objectionable matter is mailed, but also at the place of address or delivery.

S.Rep. No. 1839, *reprinted in* U.S.Code Cong. & Admin.News 4012 (1958). Thus, congressional history indicates that each mailing constitutes a separate violation of 18 U.S.C. § 1461.

The fact that each mailing represents a separate offense which may be prosecuted either in the district from which the material was mailed or in the district of its destination indicates that each mailing constitutes different criminal conduct. Thus, first applying the *Blockburger* test, Easley's prosecution for mailings in Kentucky would not run afoul of the double jeopardy clause because the government is required to establish the fact of each separate mailing into Kentucky. These would be different facts than the fact that mailings occurred in Washington or Minnesota, and therefore, pass muster under *Blockburger*. Turning then to the second prong of *Grady*, the government would not be required to prove as an essential element in this prosecution, conduct which was an offense in the prior prosecution because each separate mailing constitutes different criminal conduct and a separate offense.[3] In conclusion, we hold that subsequent prosecutions for separate mailings in different jurisdictions under the federal obscenity statutes do not violate the double jeopardy clause.

We now turn to the remaining count of the Kentucky indictment. Count 1 charges Easley, Hunter and Diverse with conspiracy to send through the mails or to ship four sets of obscene materials into Kentucky. Easley asserts that all the mailings to Washington, Minnesota and Kentucky were part of a single conspiracy and therefore, he cannot be charged in separate proceedings. *See United States v. Cohen*, 197 F.2d 26, 29 (3rd Cir.1952) ("While a prosecution for one conspiracy is no bar to a prosecution for participation in another, a single conspiracy cannot be split up for the purpose of prosecution.").

Under *Blockburger*, the conspiracy charge in Count 1 passes constitutional muster. In order for the government to demonstrate a conspiracy here it is required to show the existence of an agreement between Easley, Hunter and Diverse

---

**3.** We note, however, that *Grady* would preclude the government from prosecuting a defendant for mailing obscene materials in the jurisdiction from which the material was mailed and subsequently in the jurisdiction of the mailing's destination for the *same mailing*, despite the fact that 18 U.S.C. § 1461 allows for prosecution in either jurisdiction. In this circumstance, the government would be prosecuting the defendant twice for literally the same conduct—the act of a single mailing—giving rise to concerns such as the government prosecuting in different jurisdictions to perfect its case as discussed in *Grady*. *See* 110 S.Ct. at 2093.

to distribute the obscene materials through the mails, as well as the fact that mailings occurred. Neither the Washington nor the Minnesota prosecutions required a showing of such an agreement. Those prosecutions only required that the government prove that the mailings in fact occurred and that Easley was in control of the operation which caused the mailings to occur. Thus, the government was required to prove a fact in this conspiracy prosecution which was not required in the prior prosecutions. *See, Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182.

In addition, we find that Easley's prosecution for conspiracy under Count 1 of the Kentucky indictment also passes muster under the second prong of the *Grady* analysis. Under this prong, the second prosecution is barred if "to establish an essential element of [the] offense charged in that prosecution, [the government] will prove conduct that constitutes an offense for which the defendant has already been prosecuted." 110 S.Ct. at 2093. In this case, in order to demonstrate agreement and participation in the conspiracy, the government must prove that Easley was in control of Diverse and caused the mailings to occur. It is clear that an agreement is an "essential element" of the conspiracy charge. It is also clear that the government will use the same evidence to demonstrate Easley's control of Diverse for the conspiracy count as it did in prosecuting Easley for causing the materials to be mailed in Washington and Minnesota. However, *Grady* expressly rejects the application of a "same evidence" test for determining the propriety of a second prosecution. 110 S.Ct. at 2093. Rather, the key is whether the conduct to be proved constitutes "an offense for which the defendant has already been prosecuted." *Id.*

In *Grady* the defendant was prosecuted for drunk driving and swerving right of the median. In the subsequent prosecution, the government sought to prove vehicular manslaughter and other offenses by showing that the defendant was driving drunk and swerving right of the median. Thus, the conduct to be proved was literally an offense for which the defendant had already been prosecuted. Such is not the case with respect to Easley. While demonstration of Easley's control of Diverse was an evidentiary step toward demonstrating that Easley caused the materials to be mailed in Washington and Minnesota, Easley was not prosecuted for running Diverse. *See United States v. Calderone,* 917 F.2d 717, 724 (2d Cir.1990) (Newman, J., concurring) ("I think it is clear that *Grady* does not go so far as to preclude proof of conduct that was only *evidence of an element of the prior offense.*") (emphasis added). Easley's prior offenses were the mailings, and as we have discussed above, each mailing was a separate offense.[4] Thus, Easley's prosecution in Kentucky for conspiracy to distribute obscene materials in Kentucky does not run afoul of the double jeopardy clause. We note, however, that should the government seek to prosecute Easley in yet another jurisdiction for conspiracy to distribute obscene materials, it would be barred from the subsequent prosecution unless it could prove the conspiracy using different conduct from the conduct used to demonstrate a conspiracy here. *See Grady,* 110 S.Ct. at 2094.

In sum, this case presents a situation in which Easley caused obscene materials to be mailed or sent on several occasions to several different Postal Inspectors at sev-

---

4. Thus, this case is distinguishable from *United States v. Felix,* 926 F.2d 1522 (10th Cir.1991). In *Felix,* a defendant was prosecuted for attempt to manufacture drugs in Missouri. Later, he was charged with conspiracy to manufacture drugs in Oklahoma. In determining that *Grady* barred the second prosecution, the court noted that "[i]n addition to the overlap in the conduct giving rise to the successive prosecutions, the two offenses did not involve different persons, places, or times." *Id.* at 1530. The indictment in both cases charged the defendant with conduct which took place in both states. However, the Kentucky indictment charges Easley with conspiracy to commit federal crimes in Kentucky and lists as overt acts in furtherance of the conspiracy only those mailings made to Kentucky. As these mailings are separate and distinct criminal conduct from the mailings in Washington and Minnesota, this case involves different offenses which occurred in different places and at different times.

eral different addresses. We find that each one of these transactions involved different legal conduct even if the physical act of mailing, or the obscene materials mailed might have been the same. The addition of the conspiracy count here does not change the analysis because proof of all the essential elements of the conspiracy count does not require proof of conduct for which Easley was already convicted. Thus, Easley's indictment in Kentucky on the conspiracy count did not implicate the double jeopardy clause.[5]

## III.

Easley's next contention is that the district court erred in instructing the jury on the third prong of the *Miller* test, which requires the jury to determine whether the particular challenged expression "lacks serious literary, artistic, political or scientific merit." In *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), the Supreme Court held that the third prong of the *Miller* test was to be judged by a "reasonable person" standard—a nationally uniform objective standard—rather than by the "contemporary community standards" which govern the first two prongs of *Miller*. *Id.* at 500, 107 S.Ct. at 1920. Easley asserts that the district court erred in failing to make it clear to the jury that they were to judge the merit of the materials applying a "reasonable person" standard rather than "contemporary community standards."

 We review the sufficiency of jury instructions by looking to whether the instructions, viewed in the context of the overall charge, were sufficiently clear to ensure that the jury understood the relevant legal standards for each element of the offense. *See United States v. Park*, 421 U.S. 658, 674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975). In the instant case, the district court instructed the jury as follows:

For material to be obscene, it must be shown that the average person *applying contemporary community standards* when viewing the material as a whole would find, first, that the work appeals to the prurient interest; second, that it depicts or describes sexual conduct in a patently offensive way; and third, that the material lacks serious literary, artistic, political or scientific value.

J. App. at 328 (emphasis added). This passage erroneously states the standard under *Miller* and *Pope*. Instead of applying an objective reasonable person standard, as required, it says that the "average person applying contemporary community standards," or local standards, must find "that the material lacks serious literary, artistic, political or scientific value." Later the court gave another instruction in which it articulated the correct standard.

The third test to be applied in determining whether material is obscene is whether the material taken as a whole by a reasonable person lacks serious literary, artistic, political or scientific value. An item may have serious value in one or more of these areas, even though it portrays explicit sexual conduct. It is for you to say whether the material in this case has such value. All three of these tests must be met before the material can be found to be obscene.

*Id.* at 330. The result of the two conflicting instructions was to create considerable confusion in the jury as to what standard they were to apply to the materials for each prong of the *Miller* test. Thus, the instructions taken as a whole, did not adequately clarify for the jury the correct legal standards for analysis of the merit of the materials under *Miller* and *Pope*. *See Park*, 421 U.S. at 674, 95 S.Ct. at 1912 (jury instructions taken as a whole must clarify the relevant legal standards for each element of each offense).

---

5. At trial, Easley was acquitted on the conspiracy count. However, we undertook to analyze the count of conspiracy, despite Easley's acquittal, as he alleged he never should have been subjected to such prosecution in the first place. While the impact of an acquittal versus the dismissal of the indictment may have little substantive impact at this stage in the proceedings, we felt that Easley was entitled to know whether the indictment against him should have been dismissed as well as whether he was subject to prosecution for conspiracy in any subsequent proceedings against him.

However, determining that the instructions given at trial were erroneous does not end the inquiry. Rather, *Pope* dictates that we apply the standard of review for determining harmless constitutional error articulated in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in order to decide whether the trial court's failure to properly instruct the jury on the third prong of the *Miller* test requires a reversal of the conviction. *Pope*, 481 U.S. at 501–04, 107 S.Ct. at 1921–23. *Chapman* held that constitutional error can be found harmless only if that the error was harmless beyond a reasonable doubt. 386 U.S. at 21–24, 87 S.Ct. at 826–828. In this case, as directed by *Pope*, we must therefore review the materials to determine whether any reasonable jury if properly instructed could have found them to have value under the third prong of *Miller*. *See Pope*, 481 U.S. at 503, 107 S.Ct. at 1922 ("[I]f a reviewing court concludes that no rational juror, if properly instructed, could find value in the [materials], the convictions must stand.") To this end, we have carefully reviewed the films and magazines sent by Easley into Kentucky. Based upon our review of the materials, we are unable to say that a jury, properly instructed, would not find value in these materials beyond a reasonable doubt. It seems probable that the first erroneous instruction telling the jurors to judge the materials by local community standards rather than by an objective reasonable person standard affected the jury's judgment in this case. The conclusion a juror might draw as to the merit of the materials might substantially differ if that juror applied the standards of the local community in Kentucky and those broader standards which take account of the views of the "reasonable person" in the nation as a whole. Therefore, while we think it is a close case, we reverse Easley's conviction and remand for a new trial.[6]

### IV.

█] Easley's final contention is that prosecuting him in multiple jurisdictions for mailing obscene materials is harassment and violates due process. Easley relies primarily on the court's reasoning in *United States v. American Honda Motor Co.*, which held that

> entirely apart from the double jeopardy provision of the Fifth Amendment, successive grand jury inquiries and indictments for alleged separate conspiracies arising out of the same transaction may, and in this situation do, constitute harassment in violation of the Due Process provision of the Fifth Amendment[.]

271 F.Supp. 979, 987 (N.D.Ca.1967); *see, also, PHE, Inc. v. Dep't of Justice*, 743 F.Supp. 15, 27 (D.D.C.1990) (enjoining multiple prosecutions for distributing adult-oriented materials which the government acknowledged were not obscene as violative of due process); *Freedberg v. Dep't of Justice*, 703 F.Supp. 107, 112–13 (D.D.C.1988) (enjoining simultaneous prosecutions for distributing adult materials which the government acknowledged were not obscene). We recognize, as the courts did in *American Honda*, *PHE, Inc.* and *Freedberg*, that multiple prosecutions brought by the government for the purpose of harassment, or in bad faith, may violate due process. However, there is no evidence of any impermissible motivation behind the government's prosecution of Easley in multiple jurisdictions. Unlike *PHE, Inc.* and *Freedberg*, this is not a case in which the government is prosecuting persons for shipping what it acknowledges to be constitutionally protected material for the impermissible purpose of chilling the distribution of such materials. Absent such evidence of government misconduct, Easley's separate prosecutions for different instances of mailing obscene materials in different jurisdictions do not raise any due process concerns.

### V.

For the aforestated reasons, Easley's conviction is REVERSED and the case is REMANDED for new trial.

---

**6.** Easley has raised a number of other errors allegedly committed by the court during trial. However, as we are reversing and remanding for new trial based upon an error in the jury instructions, we need not address Easley's other assignments of error at trial.

WELLFORD, Senior Circuit Judge, concurring in part and dissenting in part:

Judge Jones has well stated in Part I the factual context of this case. I concur fully with the conclusions reached in Part II dealing with Easley's double jeopardy claim. Each one of the mailings involved different legal conduct, and *Grady v. Corbin*, —— U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), does not indicate that any of the indictment charges in the instant case represent double jeopardy violations. *See Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990); *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); and *United States v. Linetsky*, 533 F.2d 192 (5th Cir.1976).

I must dissent, however, from the conclusion reached in Part III dealing with the jury instructions given the jury in this case. In defendant's opening brief, the jury instruction issue comprised approximately three pages, citing four Supreme Court decisions, on the "contemporary community standards" portion of the district court's instructions. Defendant stated in his opening brief that "[t]he current constitutional test for judging obscenity was established ... in *Miller v. California* [, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) ]" (tripartite test prescribed ... provides the basic guidelines.)

This part of the extended jury instructions defendant charged to be reversible error:

> For material to be obscene, it must be shown that the average person applying contemporary community standards when viewing the material as a whole would find, first, that the work appeals to the prurient interest; second, that it depicts or describes sexual conduct in a patently offensive way; and third, that the material lacks serious literary, artistic, political or scientific value.

In substance, defendant's claim was that the third prong of the *Miller* test ("whether a reasonable person would find the work, taken as a whole, lacks serious literary, artistic, political or scientific value")

was erroneously instructed since *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), mandates an "objective reasonable person standard and not by reference to contemporary community standards." Defendant's Opening Brief at 36. Defendant conceded, however, that "later in the charge" the district judge "made reference to the reasonable person standard" without defining a "reasonable person." In his reply brief, defendant made no further reference to, or argument about, this proposition of prejudicial error in the instruction under *Miller* or *Pope* (or *Hamling*, or *Smith v. United States*, 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977) (also cited in the opening brief).

After argument in this case, when the panel raised questions about whether there might be harmless error on this one issue (out of nine raised) and authorized supplemental briefs,[1] defendant first began to argue a "rational reasonable person standard as opposed to a subjective community standard." Defendant only then made reference to, and made objection to, what the district court had defined as the applicable "community." In addition, for the first time, defendant objected to a brief sentence in the instructions after the portion heretofore quoted—"It is for you to say whether the material in this case has such value (serious literary, artistic, political or scientific value)." Defendant, at the same time, acknowledged that harmless error considerations might be applied in case the errors he claimed were indeed found to exist by this court.

The government's supplemental brief addressed only the harmless error question, arguing both that the jury instructions should be "read as a whole," and that "any error did not rise to the level of constitutional error," and that if error were determined, it "was harmless beyond a reasonable doubt."

*Pope v. Illinois*, 481 U.S. at 500–01, 107 S.Ct. at 1920–21, held that

> [t]he proper inquiry is not whether an ordinary member of any given communi-

1. Supplemental briefs were to be contemporaneously filed by the parties.

ty would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value.... The Court stated that even if the improper standard were applied, the harmless error doctrine applied "if the facts that the jury necessarily found established guilt beyond a reasonable doubt." *Id.* at 503, 107 S.Ct. at 1922. *Pope* concluded that "if a reviewing court concludes that no rational juror, if properly instructed, could find value in the [materials in controversy], the convictions should stand." *Id.* There was a remand in *Pope* to consider harmless error. On remand, the Illinois court found the error to be harmless because "the obscenity of the magazines is obvious." 162 Ill. App.3d 299, 113 Ill.Dec. 547, 553, 515 N.E.2d 356, 362 (1987).

I agree with Judge Jones that the district court in the latter part of its jury instructions "articulated the correct standard ... [on] ... the third prong of the *Miller* test," adding to the jury, "[i]t is for you to say whether the material in this case has such value." I agree further that the differing instructions might, at most, "create the *possibility*" of confusing the jury. (Emphasis added). I disagree with the court's conclusion on harmless error, however, because it is clear to me that "no rational juror" in this case under the facts found (which are virtually undisputed) could find *serious* literary, artistic, political or scientific value in the materials shipped and seized in the Western District of Kentucky. I would unhesitatingly conclude that, if there were any error in the instructions taken as a whole on this third *Miller* prong, it constituted harmless error beyond a reasonable doubt. The majority concedes it to be a "close case" for reversal on the finding that error had occurred due to mere possibility of considerable jury confusion. I disagree since the error, if any, is harmless. I also doubt, moreover, that there was constitutional error in this case. In any event, as in *Pope*, the obscenity in the materials at issue was obvious as a matter of law.[2] I find nothing at all erroneous in the court's instruction to the jury that it was for the jurors ultimately to determine whether the material had any serious value as described in the third *Miller* prong.

It is conceded that near the end of the district court's instructions it gave an appropriate third prong instruction making reference to the reasonable person standard. Taking the instruction as a whole, I would conclude that the instruction was not erroneous with respect to *Miller* and *Pope* standards. The closing arguments to the jury also made it clear that the jury was to use the reasonable person standard.

> The third prong is that a reasonable person—you are going to deviate from the average person in this community. You are talking about a reasonable person, what reasonable persons might do, might think. Would they find the material lacks serious literary, artistic, political or scientific value, again viewing that as a whole.

J/A at 325 (government's argument).

> The third prong deals with a reasonable person, whether viewing the material as a whole would find whether it has scientific, political or educational value or artistic value. I've been challenged to submit to you how it has political value.

J/A at 326 (defense argument).

The district court cautioned the jury to consider the instructions "as a whole"—not "to single out one [part] alone as stating the law." J/A at 327. All these circumstances indicate to me that the instructions given, *taken as a whole,* are not erroneous. Even if erroneous, as stated, the error in this concededly "close case" should be found to be harmless. The Supreme Court has only recently applied the harmless error rule in a case to "involuntary" confessions. *Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

Since this Court's landmark decision in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in which we adopted the general rule that a con-

2. Also, as in Pope, no evidence was presented, expert or otherwise, that the materials in this case contained "serious literary, artistic, political or scientific value."

stitutional error does not automatically require reversal of a conviction, the Court has applied harmless error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless. *See, e.g., Clemons v. Mississippi,* 494 U.S. [738], ——, ——, 110 S.Ct. 1441, 1450–1451, 108 L.Ed.2d 725 (1990) (unconstitutionally *overbroad jury instructions* at the sentencing stage of a capital case); *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause); *Carella v. California,* 491 U.S. 263, [266–67], 109 S.Ct. 2419, 2421, 105 L.Ed.2d 218 (1989) (*jury instruction containing an erroneous conclusive presumption*); *Pope v. Illinois,* 481 U.S. 497, 501–504, 107 S.Ct. 1918, 1921–1923, 95 L.Ed.2d 439 (1987) (*jury instruction misstating an element* of the offense); *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (jury instruction containing an erroneous rebuttable presumption)....

111 S.Ct. at 1263 (emphasis added).

Because I believe that the jury instruction at issue, considered in its entirety, and considering the arguments to the jury about a reasonable person third prong standard, had no legally erroneous and prejudicial effect, I would affirm the conviction.

Even if the jury instruction were found to contain error in one sentence, possibly confusing the jury, I would apply the harmless error rule frequently applied in such cases by the Supreme Court to erroneous instructions where the evidence of guilt is apparent as in this case. I, therefore, dissent.